# SACHER ET AL. *v.* UNITED STATES.

No. 201, Oct. Term, 1950.   Argued January 9, 1952.—Decided
March 10, 1952.

*Paul L. Ross* argued the cause for petitioners. With him on the brief were *Martin Popper, Earl B. Dickerson* and *Robert W. Kenny.*

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General McInerney, Robert L. Stern* and *Robert W. Ginnane.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

After a turbulent nine months of trial, eleven Communist Party leaders were convicted of violating the Smith Act.[1] On receiving the verdict, the trial judge at once filed a certificate under Rule 42 (a), Fed. Rules Crim. Proc., finding petitioners guilty of criminal contempt and imposing various jail terms up to six months. Those sentenced were defense counsel, with the exception of one defendant who had elected to conduct his own case.

The Court of Appeals reviewed the judge's action, both on facts and law, reversed some specifications of contempt, but affirmed the conviction and sentences.[2] Judge Augustus Hand, who favored affirmance on all charges, pronounced petitioners' conduct concerted and wilfully obstructive and described it as including "persistent obstructive colloquies, objections, arguments, and many groundless charges against the court . . . ."[3] Judge Frank, who favored reversal of those specifications which were reversed, declared that the court affirmed the remaining ones "only because of the lawyers' outrageous conduct—conduct of a kind which no lawyer owes his client, which cannot ever be justified, and which was never em-

---

[1] *Dennis* v. *United States,* 341 U. S. 494.

[2] *United States* v. *Sacher,* 182 F. 2d 416.

[3] *Id.,* at 423.

4

ployed by those advocates, for minorities or for the unpopular, whose courage has made lawyerdom proud." [4] Judge Clark, who would have reversed the entire judgment because of the procedure under consideration by us, began his opinion: "To one schooled in Anglo-Saxon traditions of legal decorum, the resistance pressed by these appellants on various occasions to the rulings of the trial judge necessarily appears abominable." [5]

The actual effect of petitioners' conduct on the trial and on the burden of subsequent courts in reviewing an unnecessarily large record also was noted by a differently composed Court of Appeals when they sought reversal of their clients' conviction and assigned misconduct and bias of the trial judge as one of the grounds. The Court. found that it could not consider the accusations against the judge separately from behavior of counsel. It unanimously found their charges against the trial judge "completely unconvincing," and of their own conduct said, "All was done that could contribute to make impossible an orderly and speedy dispatch of the case . . . ." [6] The nature of this obstruction was thus described:

> "The record discloses a judge, sorely tried for many months of turmoil, constantly provoked by useless bickering, exposed to offensive slights and insults, harried with interminable repetition, who, if at times he did not conduct himself with the imperturbability of a Rhadamanthus, showed considerably greater self-control and forbearance than it is given to most judges to possess." [7]

We denied petition for further review of the contempt issue.[8] On reconsideration, however, the importance of

[4] *Id.,* at 454.

[5] *Id.,* at 463.

[6] *United States* v. *Dennis,* 183 F. 2d 201, 225.

[7] *Id.,* at 226.

[8] 341 U. S. 952.

clarifying the permissible practice in such cases persuaded us to grant certiorari, limited to one question of procedure on which there was disagreement in the court below. Our order stated the issue for consideration:

". . . The sole question for review is: Was the charge of contempt, as and when certified, one which the accusing judge was authorized under Rule 42 (a) . . . to determine and punish himself; or was it one to be adjudged and punished under Rule 42 (b) only by a judge other than the accusing one and after notice, hearing, and opportunity to defend?" [9]

The certificate of contempt fills sixty pages of our record and incorporates, by reference, the 13,000 pages of trial record. The certificate in full [10] and summary of relevant evidence have been reported below. Because our limited review does not require or permit reexamination of the facts, no purpose would be served by detailed recitals. It is relevant to the questions of law to observe that the behavior punished as a result of the Court of Appeals' judgment has these characteristics: It took place in the immediate presence of the trial judge; it consisted of breaches of decorum and disobedience in the presence of the jury of his orders and rulings upon the trial; the misconduct was professional in that it was that of lawyers, or of a layman acting as his own lawyer. In addition, conviction is not based on an isolated instance of hasty contumacious speech or behavior, but upon a course of conduct long-continued in the face of warnings that it was regarded by the court as contemptuous. The nature of the deportment was not such as merely to offend personal sensitivities of the judge, but it prejudiced the expeditious, orderly and dispassionate conduct of the trial.

---

[9] 342 U. S. 858.

[10] 182 F. 2d at 430–453.

6

We have taken no issue as to the statute which confers power on a federal court to punish for contempt,[11] but only as to the regularity of the procedure under Rule 42,[12] designed to provide for the manner of exercising

[11] 18 U. S. C. § 401, "Power of court," provides:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

18 U. S. C. § 402, "Contempts constituting crimes," provides for criminal contempt prosecutions of acts which are in themselves criminal as well as contemptuous, but adds:

"This section shall not be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and all other cases of contempt not specifically embraced in this section may be punished in conformity to the prevailing usages at law."

[12] Rule 42, Fed. Rules Crim. Proc., "Criminal Contempt," reads:

"(a) SUMMARY DISPOSITION. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

"(b) DISPOSITION UPON NOTICE AND HEARING. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in

that power. The issue we accepted for review is a narrow one. Petitioners do not deny that they might have been summarily punished for their conduct without hearing under Rule 42 (a) if the trial judge had acted at once upon occurrence of each incident. But it is contended that this power of summary punishment expired by reason of two circumstances: (1) that the trial judge awaited completion of the trial, at which time its progress could no longer be obstructed, and hence, it is said, summary action had become unnecessary; and (2) that he included in the certificate a charge that the contemptuous instances were the result of agreement between counsel which, if it existed, was not made in his presence. Therefore, it is argued that petitioners could not be convicted or sentenced except after notice, time for preparation of a defense, and hearing, probably before another judge, as provided in Rule 42 (b).

Rule 42 obviously was intended to make more explicit "the prevailing usages at law" by which the statute has authorized punishment of contempts. 18 U. S. C. §§ 401, 402. No legislative history sheds light on this issue. Practice of District Judges has not been uniform when they have deemed resort to the power necessary.[13] A variety of questions concerning contempt powers, limitations

---

which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."

[13] In *Hallinan* v. *United States*, 182 F. 2d 880, cert. denied, 341 U. S. 952, defense counsel was summarily adjudged in contempt under Rule 42 (a) and sentenced to six months' imprisonment while the trial was still in progress. The trial judge's power to do so was sustained over the objection that he had delayed overnight and that part of the conduct specified was that of four and five days earlier. In *MacInnis* v. *United States*, 191 F. 2d 157, cert. denied this date, 342 U. S. 953,

8

and procedures have been considered by this Court,[14] but none construed this Rule, which was promulgated by this Court in 1944 and became effective March 26, 1946. Cases prior to it grew out of facts so distinguishing that their decisions are of little value as precedents.

Summary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes. But the very practical reasons which have led every system of law to vest a contempt power in one who presides over judicial proceedings also are the reasons which account for it being made summary. Our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers. But their strife can pervert as well as aid the judicial process unless it is supervised and controlled by a neutral judge representing the overriding social interest in impartial justice and with power to curb both adversaries. The rights and immunities of accused persons would be exposed to serious and obvious abuse if the trial bench did not possess and frequently exert power to curb prejudicial and excessive zeal of prosecutors. The interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders.

---

defense counsel was adjudged in contempt for conduct the day before. Filing of the certificate of contempt was delayed more than three weeks, and it was announced that the fixing of the punishment would be deferred until the end of the trial. When the trial was concluded two months after the contempt, counsel was immediately sentenced to three months' imprisonment. The trial judge's power to do so was upheld.

[14] Among them: *Ex parte Terry,* 128 U. S. 289; *Cooke* v. *United States,* 267 U. S. 517; *Nye* v. *United States,* 313 U. S. 33; *Pendergast* v. *United States,* 317 U. S. 412; *In re Michael,* 326 U. S. 224.

Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge— his right is only respectfully to preserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation. These are such obvious matters that we should not remind the bar of them were it not for the misconceptions manifest in this case.

The Rule in question contemplates that occasions may arise when the trial judge must immediately arrest any conduct of such nature that its continuance would break up a trial, so it gives him power to do so summarily. But the petitioners here contend that the Rule not only permits but requires its instant exercise, so that once the emergency has been survived punishment may no longer be summary but can only be administered by the alternative method allowed by Rule 42 (b). We think "summary" as used in this Rule does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial. The purpose of that procedure is to inform the court of events not within its own knowledge. The Rule allows summary procedure only as to offenses within the knowledge of the judge because they occurred in his presence.

Reasons for permitting straightway exercise of summary power are not reasons for compelling or encourag-

ing its immediate exercise. Forthwith judgment is not required by the text of the Rule. Still less is such construction appropriate as a safeguard against abuse of the power. If the conduct of these lawyers warranted immediate summary punishment on dozens of occasions, no possible prejudice to them can result from delaying it until the end of the trial if the circumstances permit such delay. The overriding consideration is the integrity and efficiency of the trial process, and if the judge deems immediate action inexpedient he should be allowed discretion to follow the procedure taken in this case. To summon a lawyer before the bench and pronounce him guilty of contempt is not unlikely to prejudice his client. It might be done out of the presence of the jury, but we have held that a contempt judgment must be public.[15] Only the naive and inexperienced would assume that news of such action will not reach the jurors. If the court were required also then to pronounce sentence, a construction quite as consistent with the text of the Rule as petitioners' present contention, it would add to the prejudice. It might also have the additional consequence of depriving defendant of his counsel unless execution of prison sentence were suspended or stayed as speedily as it had been imposed. The procedure on which petitioners now insist is just the procedure most likely to achieve the only discernible purpose of the contemptuous conduct. Had the trial judge here pursued that course, they could have made a formidable assertion that it was unfair to them or to their clients and that a new trial was required on account of it.

In this case counsel repeatedly were warned that their conduct was regarded as contemptuous. No claim can be made that the judge awaited the close of the trial to pounce upon them for some offense unnoted at the time

---

[15] *In re Oliver*, 333 U. S. 257.

it occurred. If we were to hold that summary punishment can be imposed only instantly upon the event, it would be an incentive to pronounce, while smarting under the irritation of the contemptuous act, what should be a well-considered judgment. We think it less likely that unfair condemnation of counsel will occur if the more deliberate course be permitted.

We hold that Rule 42 allows the trial judge, upon the occurrence in his presence of a contempt, immediately and summarily to punish it, if, in his opinion, delay will prejudice the trial. We hold, on the other hand, that if he believes the exigencies of the trial require that he defer judgment until its completion he may do so without extinguishing his power.

The other reason ascribed for reversing this case is that the accusing judge charged the petitioners, among other things, with an agreement deliberately entered into in a cold and calculated manner, "to impair my health." It is not charged that such an agreement was made in the presence of the judge. We need not determine whether a proper construction of the certificate would be that the concert of action which did take place in his presence amounted to an implied agreement or as charging an earlier express verbal agreement to act in concert. This specification was reversed by the Court of Appeals, which, however, found the judgment amply sustained without it, and considered the substantive offenses separable and independent, as do we. It found the judgment amply sustained without the conspiracy count. The sentences ran concurrently, so reversal of one does not require reversal of the other.

A construction of the Rule is advocated which would deny a judge power summarily to punish a contempt that is personal to himself except, perhaps, at a moment when it is necessary to forestall abortion of the trial. His only recourse, it is said, is to become an accuser or complaining witness in a proceeding before another judge.

The Rule itself expresses no such limitation, and the contrary inference is almost inescapable. It is almost inevitable that any contempt of a court committed in the presence of the judge during a trial will be an offense against his dignity and authority. At a trial the court is so much the judge and the judge so much the court that the two terms are used interchangeably in countless opinions in this Court and generally in the literature of the law, and contempt of the one is contempt of the other. It cannot be that summary punishment is only for such minor contempts as leave the judge indifferent and may be evaded by adding hectoring, abusive and defiant conduct toward the judge as an individual. Such an interpretation would nullify, in practice, the power it purports to grant.

We are urged that these sentences will have an intimidating effect on the legal profession, whose members hereafter will decline to appear in trials where "defendants are objects of hostility of those in power," or will do so under a "cloud of fear" which "threatens the right of the American people to be represented fearlessly and vigorously by counsel."

That contempt power over counsel, summary or otherwise, is capable of abuse is certain. Men who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir. Most judges, however, recognize and respect courageous, forthright lawyerly conduct. They rarely mistake overzeal or heated words of a man fired with a desire to win, for the contemptuous conduct which defies rulings and deserves punishment. They recognize that our profession necessarily is a contentious one and they respect the lawyer who makes a strenuous effort for his client.

The profession knows that no lawyer is at the mercy of a single federal trial judge. This case demonstrates

that before punishment takes effect he may have appeal on law and fact to the Court of Appeals. Petitioners, as yet, have served no part of their sentences but have been enlarged on bail while their conduct has been directly reviewed by one Court of Appeals on their own appeal and considered indirectly by a differently composed Court of Appeals on their clients' appeal. Some of those judges had trial and appellate experience almost unparalleled in length and variety. These lawyers have not been condemned, as they claim, merely by the impulse of one lone and hostile judge. Their conduct has been condemned by every judge who has examined this record under a duty to review the facts. It is to be doubted whether the profession will be greatly terrorized by punishment of some of its members after such extended and detached consideration. Moreover, if power of contempt excites fear and terror in the bar, it would hardly be relieved by upholding petitioners' contention that the judge may proceed against a lawyer at the precise moment of maximum heat but may not do so if he awaits a cooler second thought.

We are not unaware or unconcerned that persons identified with unpopular causes may find it difficult to enlist the counsel of their choice. But we think it must be ascribed to causes quite apart from fear of being held in contempt, for we think few effective lawyers would regard the tactics condemned here as either necessary or helpful to a successful defense. That such clients seem to have thought these tactics necessary is likely to contribute to the bar's reluctance to appear for them rather more than fear of contempt.

But that there may be no misunderstanding, we make clear that this Court, if its aid be needed, will unhesitatingly protect counsel in fearless, vigorous and effective performance of every duty pertaining to the office of the advocate on behalf of any person whatsoever. But it will

14

not equate contempt with courage or insults with independence. It will also protect the processes of orderly trial, which is the supreme object of the lawyer's calling.

*Affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

I would reverse these convictions because of my belief that (1) the Judge should not have passed on the contempt charges he preferred; (2) whatever judge considered the charges, guilt should not have been summarily decided as it was—without notice, without a hearing and without an opportunity for petitioners to defend themselves; (3) petitioners were constitutionally entitled to have their guilt or innocence of criminal contempt decided by a jury.

After a nine months' trial of leaders of the Communist Party a jury brought in a verdict of guilty and was discharged. Immediately, presiding Judge Medina asked all the defendants' lawyers [1] to stand up, then read them a very minor part of a lengthy "contempt certificate" in which they were alleged to have committed many acts of contempt at various times during the protracted trial. Without affording any of them a chance to say a word before he acted, the presiding Judge held all of them guilty of contempt and sentenced each one to prison.

*First.* I think it was a grave error for the Judge to pass on the charges he brought. Reasons why he should not have done so have been forcefully presented by MR. JUSTICE FRANKFURTER here and by Judge Charles Clark in the Court of Appeals. Their arguments that Judge Medina should not have made these adjudications

---

[1] The defendant Dennis, who had acted as his own lawyer, is included in this group.

are vividly buttressed by the collection of trial episodes placed in the appendix to MR. JUSTICE FRANKFURTER's opinion, *post,* p. 42. These episodes bespeak an attitude of distrust of the lawyers and, I regret to add, of hostility to them, generally deemed inconsistent with that complete impartiality the process of judging demands. Facts that appear of special importance to me in considering what were the Judge's personal feelings towards those he convicted are these:

The presiding Judge was convinced that the lawyers had deliberately and calculatingly badgered and insulted him throughout the long months of trial. Among these insults, so the Judge believed and declared, were insolent, sarcastic, impudent and disrespectful charges that he angled for newspaper headlines; connived with the United States Attorney; entertained racial prejudice; judicially acted with "bias, prejudice, corruption, and partiality." He found and repeatedly declared that these lawyers were acting in concerted agreement in an attempt to create confusion, provoke incidents and break down his health. As the trial progressed, the record shows that the Judge expressed stronger and stronger fears that the alleged conspiracy to destroy his health was about to succeed. This belief may explain his sharp and somewhat heated repartee in his frequent controversies with counsel. But whatever the provocation, the record shows a constantly growing resentment of the Judge against the lawyers.

The Judge's distrust of and disrespect for the lawyers clearly appear from his frequent charges that their statements were false and unreliable. These repeated accusations, as particularly shown by the following colloquy, impress me as showing such bitter hostility to the lawyers that the accuser should be held disqualified to try them:

"Mr. Sacher: I am offended on these constant aspersions on the veracity of representations that I

make. I am an officer of this court and I resent these—

"The Court: There was an instance when you deliberately lied to me when they were passing these press releases. You said that they were not and you were caught red-handed.

"Mr. Sacher: That is the most offensive charge that can be made against an officer of the court. . . . What has a lawyer got but his honor.

"The Court: . . . you were caught red-handed.

"Mr. Sacher: That is the most detestable thing I ever heard from a judge. I resent that and I urge that it be expunged from the record. . . . I will defend my honor as a member of the bar against your Honor or anybody else. . . . I think an idiot resorts to lying. I don't have to do it.

"The Court: You did it.

"We better let these little amenities go. I can see from your belligerent manner if you thought you could, you might physically come up to the bench and physically attack me. I know your manner, and it doesn't frighten me in the slightest degree." [2]

Liar ordinarily is a fighting word spoken in anger to express bitter personal hostility against another. I can think of no other reason for its use here, particularly since the Judge's charge was baseless.[3] And the Judge's personal feeling towards these lawyers, Sacher in particular, is further indicated by an occurrence immediately *after* they had been sentenced. Sacher asked and was granted the privilege of making a brief statement. This

---

[2] While the full text of the colloquy is pertinent, all of it is not repeated here as it is set out at pp. 80–81 of the appendix to MR. JUSTICE FRANKFURTER's opinion.

[3] The Court of Appeals held that the record failed to sustain the accusations that Sacher had spoken falsely about the press releases. Specification XV based on that charge was reversed.

statement was relevant and dignified.[4] Nevertheless the Judge interrupted him and used this language to a lawyer he had just abruptly and summarily sentenced to prison: "You continue in the same *brazen* manner that you used throughout the whole trial. . . . despite all kinds of warnings throughout the case, you continue with the same old *mealy-mouth* way of putting it which I have been listening to throughout the case." (Emphasis supplied.) Candor compels me to say that in this episode the decorum and dignity of the lawyer who had just been sentenced to prison loses nothing by comparison with others.

Certainly repeatedly calling a lawyer a liar marks a drastic deviation from the desirable judicial standard. A judge who does this should no more be permitted to try the lawyer he accuses than a judge should be permitted to try his own case. Cf. *Tumey* v. *Ohio,* 273 U. S. 510. No man should be forced to trial before a judge who has previously publicly attacked his personal honor and integrity. The risk to impartial justice is too great.

---

[4] The parts of Sacher's statement immediately preceding the court's interruption were as follows:

"And I respectfully submit, your Honor, that a country with an intimidated bar is a country whose liberties are in danger. Here in America we know that the American bar occupies a place of honor in the achievement and preservation of the liberties of our people, and I say, your Honor, with all due respect to your decision and judgment here that any threat to the integrity, independence and courage of the bar can only constitute a threat to the integrity and wholesomeness and preservation of our civil liberties.

"For myself let me say, your Honor, that I speak of intimidation not in personal terms. If it be necessary that in the cause of American liberty I shall have to serve six months, then I say to your Honor the price will have been very, very small. I hope that it will not be necessary in our country for an advocate to have to do that, but if it be necessary—

"The Court: It isn't the price of liberty; it is the price of misbehavior and disorder as stated in the certificate.

"Mr. Sacher: I say to your Honor—"

18

*Second.* Before sentence and conviction these petitioners were accorded no chance at all to defend themselves. They were not even afforded an opportunity to challenge the sufficiency or the accuracy of the charges. Their sentences were read to them but the full charges were not. I cannot reconcile this summary blasting of legal careers with a fair system of justice. Such a procedure constitutes an overhanging menace to the security of every courtroom advocate in America. The menace is most ominous for lawyers who are obscure, unpopular or defenders of unpopular persons or unorthodox causes.

Conviction without trial is not only inherently unfair in the first court, but the unfairness is carried up to the appellate level. This case proves that. A fair review requires scrutiny of 13,000 pages of evidence most of which is irrelevant. For the contempt certificate states: "As isolated quotations from or references to the transcript can give but a partial view of the acts, statements, and conduct above referred to, I hereby make the entire record part of these proceedings." Such a record obscured the lawyers' trial conduct in a maze of evidence that has nothing to do with their own guilt or innocence. It is not surprising that this Court shrinks from reading such a record; it refuses to do so. No assertion is made that the Court of Appeals waded through it. Consequently there is every indication that the Court of Appeals appraised the factual accuracy of Judge Medina's charges on a basis deemed by him as "inadequate" because presenting only "a partial view" of the numerous court-lawyer controversies.[5] Such an "inadequate" basis of re-

---

[5] I do not think the convictions of these lawyers for contempt should be affirmed on the theory that such has already been expressly or impliedly done by the "differently composed Court of Appeals" that affirmed conviction of the Communist leaders. That "differently composed" court merely held that no conduct of the trial judge called for reversing the convictions of the Communist leaders. I think that

view is to be expected since no hearing was held which could have framed concrete issues and focused attention on evidence relevant to them.

There are other manifest elements of unfairness in a system which calls on appellate courts to judge the trial conduct of lawyers accused of contempt on the basis of all evidence introduced against their clients in a prior criminal case. This unfairness is particularly emphasized here. The root of Judge Medina's charges was that these lawyers followed a concerted course deliberately designed to bring the whole judicial system into public contempt and disgrace. Their clients were Communist leaders. Much of the 13,000 pages of evidence was offered to show that they planned to subvert and destroy all governmental institutions, including courts. Unless we are to depart from high traditions of the bar, evil purposes of their clients could not be imputed to these lawyers whose duty it was to represent them with fidelity and zeal. Yet from the very parts of the record which Judge Medina specified, it is difficult to escape the impression that his inferences against the lawyers were colored, however unconsciously, by his natural abhorrence for the unpatriotic and treasonable designs attributed to their Communist leader clients. It appears to me that if there have ever been, or can ever be, cases in which lawyers are entitled to a full hearing before their liberty is forfeited and their professional hopes are blighted, these are such cases.

For reasons stated above and for reasons stated in the dissent of MR. JUSTICE FRANKFURTER and the dissent of Judge Charles Clark, I think these cases should be re-

---

affirmance does not support an inference that the "differently composed" court would also have sustained a judgment of contempt against the lawyers. Moreover while this "differently composed" court severely condemned the lawyers' conduct, it apparently felt constrained to imply that the trial judge "did not conduct himself with the imperturbability of a Rhadamanthus . . . ." 183 F. 2d 226.

versed because Judge Medina denied petitioners a hearing. But I would reverse on the further ground that petitioners are entitled to all the constitutional safeguards provided to protect persons charged with crime, including a trial by jury.

*Third.* Art. III, § 2 of the Constitution provides that "The Trial of all Crimes . . . shall be by Jury." Not satisfied with this single protection for jury trial, the Founders reemphasized the guaranty by declaring in the Sixth Amendment that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." And the Fifth Amendment provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." These contempt proceedings are "criminal prosecutions" brought to avenge an alleged public wrong. Petitioners were imprisoned for terms up to six months, but these terms could have been longer. The Government's position in *United States* v. *United Mine Workers of America,* 330 U. S. 258, was that the amount of punishment for the crime of contempt can be fixed at a judge's discretion, with no limit but the Eighth Amendment's prohibition against cruel and unusual punishment. Certainly, petitioners have been sentenced for crimes.[6] Consequently these lawyers have been wrongfully deprived of the jury benefits of the foregoing constitutional provisions unless they are inapplicable to the crime of contempt.

There are undoubtedly sayings in some past opinions of this Court broad enough to justify what was done here. Indeed judges and perhaps lawyers pretty generally subscribe to the doctrine that judicial institutions would

---

[6] *New Orleans* v. *Steamship Co.,* 20 Wall. 387, 392; *Gompers* v. *United States,* 233 U. S. 604, 610, 611; *Michaelson* v. *United States,* 266 U. S. 42, 66–67; *Pendergast* v. *United States,* 317 U. S. 412, 416–418; but cf. *Myers* v. *United States,* 264 U. S. 95, 103.

be imperiled if judges were without power summarily to convict and punish for courtroom offenses. Our recent decisions, however, have expressed more cautious views about the judicial authority to punish for contempt. Returning to the early views of this Court, we have marked the limits of that authority as being "the least possible power adequate to the end proposed." *In re Oliver,* 333 U. S. 257, 274, and cases there cited. The "end proposed" is "power adequate" in the court to preserve order and decorum and to compel obedience to valid court orders. To achieve these ends—decorum and obedience to orders—courts must have power to act immediately, and upon this need the power of contempt rests. Concurring opinion, *United States* v. *United Mine Workers of America, supra,* 330 U. S. at 331–332. Measured by this test, as Judge Charles Clark's dissenting opinion pointed out, there was no necessity here for Judge Medina's summary action, because the trial was over and the danger of obstructing it was passed. For the same reason there was no longer need, so far as that trial was concerned, to try petitioners for their courtroom conduct without benefit of the Bill of Rights procedural safeguards.

A concurring judge in the Court of Appeals feared that it might bring about "demoralization of the court's authority" should any one other than Judge Medina try the case. The reason given was: "For instance, in all likelihood, at a trial of the lawyers, Sacher would introduce the testimony of himself and others in an effort to prove that he was not 'angrily shouting,' as charged in Specification VII, and did not speak 'in an insolent manner,' as charged in Specification VIII; Gladstein would similarly seek to prove there he did not 'angrily' advance 'toward the bench' or make remarks in a 'truculent manner,' as charged in Specification VIII, and did not speak to the judge 'in a sarcastic and impertinent manner,' as charged

in Specification XI; etc., etc." 182 F. 2d 416, 461. What would be wrong with this? Are defendants accused by judges of being offensive to them to be conclusively presumed guilty on the theory that judges' observations and inferences must be accepted as infallible? There is always a possibility that a judge may be honestly mistaken. Unfortunately history and the existence of our Bill of Rights indicate that judicial errors may be from worse causes.

The historic power of summary contempt grew out of the need for judicial enforcement of order and decorum in the courtroom and to compel obedience to court orders. I believe the idea of judges having unrestricted power to by-pass the Bill of Rights in relation to criminal trials and punishments is an illegitimate offspring of this historic coercive contempt power. It has been said that such a "summary process of the Star Chamber slipped into the common law courts," and that the alleged ancient history to support its existence is "fiction." [7] With the specific reservation that I think summary contempt proceedings may be employed solely to enforce obedience and order, and not to impose unconditional criminal punishment, I agree with this statement of Mr. Justice Holmes: "I would go as far as any man in favor of the sharpest and most summary enforcement of order in Court and obedience to decrees, but when there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law deals with other illegal acts." *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 425–426.

---

[7] Frankfurter and Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts, 37 Harv. L. Rev. 1010, 1047. See also Nelles and King, Contempt by Publications in the United States, 28 Col. L. Rev. 401; Fox, History of Contempt of Court (1927).

I believe these petitioners were entitled to a jury trial. I believe a jury is all the more necessary to obtain a fair trial when the alleged offense relates to conduct that has personally affronted a judge. The majority here and the majority below appear to have affirmed these convictions on the assumption that appellate review so fully guarantees a fair trial that it is an adequate substitute for trial by jury. While I agree that the power of lawyer-judges to set aside convictions deemed prejudicial or erroneous is one vital safeguard of liberty, I cannot agree that it affords the full measure of security which the Constitution has provided against unjust convictions.[8] Preference for trial by a jury of laymen over trial by lawyer-judges lies behind the constitutional guarantee of trial by jury. I am among those who still believe in trial by jury as one of the indispensable safeguards of liberty.

Mr. Justice Frankfurter, dissenting.

Bitter experience has sharpened our realization that a major test of true democracy is the fair administration of justice. If the conditions for a society of free men formulated in our Bill of Rights are not to be turned into mere rhetoric, independent and impartial courts

---

[8] During the parliamentary discussion of Mr. Fox's libel bill, which sought to preserve trial by jury, it was called to the Parliament's attention that Mr. Justice Buller, while trying the Dean of St. Asaph at Shrewsbury, had declared the "rights of appeal" to be the "dearest birth-rights" of an Englishman: "The marquis [of Lansdowne] ridiculed the declaration, that a right of appeal in arrest of judgment, and of moving for a writ of error, was one of the dearest birth-rights of Englishmen, asserting that it was neither more nor less than the being turned over from one set of lawyers to another, and from that other to a third. In fact, it was to be turned over from the judge who tried the cause, to himself and three others, in a second place; and from them to themselves again, mixed with a few more judges, in a third place!" 29 Hansard, Parliamentary History of England, p. 1419.

must be available for their enforcement. To that end, courts must have the power to deal with attempts to disrupt the course of justice. This safeguard concerns not merely the litigants in a particular case; it is everyone's concern. The impartial administration of justice presupposes the dignified and effective conduct of judicial proceedings. That in turn is dependent on a proper atmosphere in the courtroom. Thus, the power of courts to punish for contempt is a means of assuring the enforcement of justice according to law. The protection of the most generously conceived civil liberties presupposes a court overawed neither by interests without nor by disruptive tactics within the courtroom. Such is the teaching of the history of English-speaking nations.

No decision of this Court has rejected this teaching. Certainly none of the professions of the Court's opinions has. While, to be sure, in a few instances restrictions too confining and, from my point of view, unwarranted have been placed upon this power of courts to punish for contempt, the power itself has never been denied. The Federal courts may, under appropriate circumstances, inflict punishment for contempt without those constitutional procedural safeguards necessary for the prosecution of crime in its historical and colloquial sense.

But this power does not authorize the arbitrary imposition of punishment. To dispense with indictment by grand jury and trial by a jury of twelve does not mean the right to disregard reason and fairness. Reason and fairness demand, even in punishing contempt, procedural safeguards within which the needs for the effective administration of justice can be amply satisfied while at the same time the reach of so drastic a power is kept within limits that will minimize abuse. While experience has shown the necessity of recognizing that courts possess this authority, experience has also proven that restrictions appropriate to the purposes of the power must fence

in its exercise. Hence Congress, by legislation dating back more than a hundred years, has put geographic and procedural restrictions upon the power of United States courts to punish summarily for contempt. See *Michaelson* v. *United States*, 266 U. S. 42; *Nye* v. *United States*, 313 U. S. 33. And even before Congress drew on its power to put limits on inherent judicial authority, this Court derived the general boundaries of this power from its purpose, see *Anderson* v. *Dunn*, 6 Wheat. 204; more recently, the Court has defined the procedure appropriate for its exercise. See *Cooke* v. *United States*, 267 U. S. 517.

The Court did so for a reason deeply imbedded in our legal system and by that very fact too often neglected. Times of tension, which are usually periods of war and their aftermath, bring it to the surface. Reflecting no doubt their concern over untoward events in law enforcement arising out of the First World War, Mr. Justice Brandeis and Mr. Justice Holmes gave quiet warning when they observed that "in the development of our liberty insistence upon procedural regularity has been a large factor." *Burdeau* v. *McDowell*, 256 U. S. 465, 477. It is not for nothing that most of the provisions of our Bill of Rights are concerned with matters of procedure.

That is what this case is about—"procedural regularity." Not whether these petitioners have been guilty of conduct professionally inexcusable, but what tribunal should sit in judgment; not whether they should be punished, but who should mete out the appropriate punishment; not whether a Federal court has authority to prevent its proceedings from being subverted, but how that authority should be exercised so as to assure the rectitude of legal proceedings and at the same time not detract from the authority of law itself.

This case arises out of the trial of the eleven Communist Party leaders whose convictions were sustained in

*Dennis* v. *United States,* 341 U. S. 494. In many ways it was a trial wholly out of the ordinary—in its length, the nature of the issues, the political and emotional atmosphere in which they were enveloped, the conduct of court and counsel, the conflicts between them. After several weeks of proceedings on pre-trial motions, the trial proper got under way. Nine weeks were consumed in getting a jury and thirty more in trying the case to the jury. Immediately after the jury brought in the verdict of guilty against the defendants, the trial judge charged the five defense lawyers and one of the defendants (who had conducted his own defense) with contempt of court during the trial. He filed a carefully prepared, elaborate certificate of contempt containing forty charges, and without further hearing found them guilty and imposed sentences ranging from thirty days' to six months' imprisonment. These specifications charged misconduct of a nature especially reprehensible when committed by lawyers, who, as officers of the court, are part of our judicial system. As such they are under a duty to further, not obstruct, the rational and fair administration of justice.

The certificate on which petitioners were found guilty of contempt charged thirty-nine occurrences during the trial as thirty-nine items of misconduct. However, these specified items were not regarded by the judge as discrete instances. He deemed them manifestations of a conspiracy by the contemnors against him. To be sure, Specifications II to XL were individually charged and therefore are technically sustainable by themselves and not merely as overt acts of the conspiracy, set forth with much detail as Specification I. But the core of the charges—the gravamen of the accusations against these petitioners—was that the petitioners had

"joined in a wilful, deliberate, and concerted effort to delay and obstruct the trial of *United States* v. *Foster,*

*et al.,* C 128–87, for the purpose of causing such disorder and confusion as would prevent a verdict by a jury on the issues raised by the indictment; and for the purpose of bringing the Court and the entire Federal judicial system into general discredit and disrepute, by endeavoring to divert the attention of the Court and jury from the serious charge against their clients of a conspiracy in substance to teach and advocate the overthrow of the Government of the United States by force and violence, by attacking the Presiding Judge and all the Judges of this Court, the jury system in this District, the Department of Justice of the United States, the President of the United States, the police of New York City, and the public press of New York and other cities."

Though the certificate makes it plain enough, a reading of the record leaves no doubt that in the judge's mind the individual occurrences set forth in Specifications II to XL derived their chief significance from his finding that they were tributary to the design upon which the petitioners had embarked—a conspiracy against the judge in order to prevent a fair trial of the issues. He found them guilty of that. But the Court of Appeals reversed—and the Government has not questioned this reversal of the trial judge—the convictions of the petitioners on the main charge, that of conspiracy. However, that court, with one judge dissenting, did sustain the convictions on thirty-seven other specifications. 182 F. 2d 416. Convictions on two specifications were found unsupported by evidence. *Ibid.*

I would not remotely minimize the gravity of the conduct of which the petitioners have been found guilty, let alone condone it. But their intrinsic guilt is not relevant to the issue before us. This Court brought the case here in order to consider whether the trial court followed the proper procedure in determining that the misconduct of

the petitioners subjected them to punishment. 342 U. S. 858. Time out of mind this Court has reversed convictions for the most heinous offenses, even though no doubt about the guilt of the defendants was entertained. It reversed because the mode by which guilt was established disregarded those standards of procedure which are so precious and so important for our society. So here, the only question for decision is whether, in the circumstances of this case, the trial judge himself should, without notice and hearing and after the successful termination of the trial, have summarily punished a series of contempts growing out of what he conceived to be a central mischievous design, committed over a period of nine months; or whether another judge, designated by the Chief Judge of the Court of Appeals or of the District Court for the Southern District of New York, should have heard, after due notice, the charges of contempt made by the trial judge. At the end of the trial the judge was not confronted with the alternatives of doing what he did or allowing the contemnors to go unpunished. The question was not punishment, but who should punish. Due regard for such procedural questions, too often misconceived as narrow and technical, alone justifies the truth of one of the great boasts of our democracy, the essential fairness of our judicial system.

The particular circumstances of this case compel me to conclude that the trial judge should not have combined in himself the functions of accuser and judge. For his accusations were not impersonal. They concerned matters in which he personally was deeply engaged. Whatever occasion may have existed during the trial for sitting in judgment upon claims of personal victimization, it ceased after the trial had terminated. It falls to this Court as head of the Federal judicial system to correct such abuse of judicial power.

All grants of power, including the verbally unlimited terms of Rule 42 (a) of the Rules of Criminal Procedure, are subject to the inherent limitation that the power shall be fairly used for the purpose for which it is conferred. It is a limitation derived not merely from general considerations of reason but from the traditional concepts of the proper discharge of the judicial function. "A criminal contempt may be punished summarily," so runs Rule 42 (a), "if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." The Rule merely permits summary punishment. It does not command summary punishment of all contempts "committed in the actual presence of the court," in all circumstances and at any time. That there are unexpressed limits to this power is recognized even by the Government. For it concedes that a judge could not summarily punish contempt without notice and hearing at any undefined time long after it has occurred in his presence. In short, Rule 42 (a), which in 1946 declared what the law was,[1] acknowledges an undefined power for imposing summary punishment without expressly laying down the boundaries of the power granted. Legislation normally carries such implications.

To recognize the generality of a power is the beginning not the end of the inquiry whether in the specific circumstances which invoked the power due regard was had for the implied restrictions. Among the restrictions to be implied, as a matter of course, are two basic principles of our law—that no judge should sit in a case in which he is personally involved and that no criminal punishment should be meted out except upon notice and due hearing, unless overriding necessity precludes such indispensable

---

[1] See Notes of Advisory Committee on Rule 42 (a), Federal Rules of Criminal Procedure.

safeguards for assuring fairness and affording the feeling that fairness has been done. Observance of these commonplace traditions has its price. It sometimes runs counter to public feeling that brooks no delay. At times it seems to entail a needlessly cumbersome process for dealing with the obvious. But as a process it is one of the cherished and indispensable achievements of western civilization. It is his disregard of these controlling traditions that forces me to conclude that the district judge, however sorely tried, erred in using the summary contempt procedure in the circumstances before him.

Happily few such exercises of summary authority have come before this Court. Still rarer are the instances where a judge is deeply involved in the conduct on which he has to pass judgment. Such a situation did come here some twenty-five years ago in *Cooke* v. *United States,* 267 U. S. 517. Mr. Chief Justice Taft then took occasion, on behalf of the whole Court, to lay down the guiding considerations which should have been followed in this case:

"The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency. The substitution of another judge would avoid either tendency but it is not always possible. Of course where acts of contempt are palpably aggravated by a personal attack upon the judge in order to drive the judge out of the case for ulterior reasons, the scheme

should not be permitted to succeed. But attempts of this kind are rare. All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. *Cornish* v. *The United States*, 299 Fed. 283, 285; *Toledo Company* v. *The United States,* 237 Fed. 986, 988.

"The case before us is one in which the issue between the judge and the parties had come to involve marked personal feeling that did not make for an impartial and calm judicial consideration and conclusion, as the statement of the proceedings abundantly shows. We think, therefore, that when this case again reaches the District Court to which it must be remanded, the judge who imposed the sentence herein should invite the senior circuit judge of the circuit to assign another judge to sit in the second hearing of the charge against the petitioner." 267 U. S. at 539.

In the *Cooke* case the Court did much more than set aside a sentence of thirty days for contempt because "the procedure pursued was unfair and oppressive," 267 U. S. 517, 538. There, as here, the contempt was by a lawyer; there, as here, the trial court's action was affirmed by a Court of Appeals in an opinion by one of the most eminent judges of his day. 295 F. 292. In reversing the two lower courts and finding an abuse of judicial discretion by the trial court, this Court did what it feels called upon to do from time to time in a class of cases that have a close kinship to matters deemed fundamental within the concept of Due Process. It defined the procedural stand-

ards to be observed by the lower courts. The general direction thus given to lower courts is not likely to be respected by them if this Court is too genial in enforcing its observance.

Enforcement is not had by repetition of generalities and sanction of their disregard in practice. We must start, no doubt, with a predisposition in favor of the propriety of a trial judge's action. His is the initial responsibility, and we must assume that the discretion with which he is entrusted will normally be exercised by judges of firmness, self-discipline, and good sense. These considerations should count heavily on review. But when men are given short shrift in being punished, abstract rules cannot dispense with the duty of the reviewing court imaginatively to re-create the courtroom drama. In order to save trial courts from being unduly hampered, it is not necessary to leave them with arbitrary power by relying on the presumption of judicial propriety to the exclusion of a sophisticated, even if indulgent, scrutiny of the record.

If we are to understand the circumstances in which the sentences under review were imposed, a close study of the record in the *Dennis* case cannot be avoided. The certificate of contempt incorporated the whole record of that case and made its findings on the basis of it. We cannot do less in passing on the propriety of the summary convictions. We cannot do less if we are to appraise fairly the power assumed by the trial court of punishing without further ado at the end of the trial conduct that took place during its long travail. This does not imply reviewing whether the conduct of these petitioners was contemptuous. The whole record is indispensably relevant to the procedural question which we brought here: how was such misconduct to be punished?

Deeply as I believe in the importance of giving wide and not niggardly scope to the discretionary powers of

trial judges and with a lifelong regard for the wisdom of
the judge who, on behalf of the Court of Appeals, found
that the discretion of the trial judge was not abused, I
cannot escape the conviction that another district judge
should have tried the contempt issue. And this, though
one may well assume that any other judge would have
been compelled to find contempt in this case and might
have imposed even severer sentences. Preserving and
enhancing respect for law is always more important than
sustaining the infliction of punishment in a particular
case.

A reading of the fifteen volumes of testimony in the
*Dennis* record leaves one with the strong feeling that the
conduct found contemptuous was in the main directed
against the trial judge personally and that the judge him-
self so regarded it. In the preamble of his contempt cer-
tificate he states that one of the purposes of the nefarious
agreement with which he charged the lawyers was "im-
pairing my health so that the trial could not continue."
The great majority of the specific acts to "effect this plan"
had the judge personally as their target. The petitioners,
so the judge found in Specification I,

>"b. Suggested that various findings by the Court
>were made for the purpose of newspaper headlines;
>
>"c. Insinuated that there was connivance between
>the Court and the United States Attorney;
>
>. . . . .
>
>"e. Persisted in making long, repetitious, and un-
>substantial arguments, objections, and protests,
>working in shifts, accompanied by shouting, sneering,
>and snickering;
>
>"f. Urged one another on to badger the Court;
>
>"g. Repeatedly made charges against the Court of
>bias, prejudice, corruption, and partiality;
>
>"h. Made a succession of disrespectful, insolent,
>and sarcastic comments and remarks to the Court;
>
>. . . . .

"k. Persisted in asking questions on excluded subject matters, knowing that objections would be sustained, to endeavor to create a false picture of bias and partiality on the part of the Court;

"l. Accused the Court of racial prejudice without any foundation; and

"m. Generally conducted themselves in a most provocative manner in an endeavor to call forth some intemperate or undignified response from the Court which could then be relied upon as a demonstration of the Court's unfitness to preside over the trial."

The conviction on Specification I was, as already indicated, reversed by the Court of Appeals. But its theme underlies the whole certificate. It conveys inescapably what the judge deemed to have been the permeating significance of the behavior of these lawyers. The "overt acts" listed in Specification I are but a compendium of the other specifications. At least twenty-nine of these describe conduct directed against the trial judge personally: charges of prejudice and racial bias, of collusion with the prosecution, of headline-seeking.

Not only were the contempts directed against the trial judge. The conduct of the lawyers had its reflex in the judge. At frequent intervals in the course of the trial his comments plainly reveal personal feeling against the lawyers, however much the course of the trial may have justified such feeling. On numerous occasions he expressed his belief that the lawyers were trying to wear him down, to injure his health, to provoke him into doing something that would show prejudice, or cause a mistrial or reversal on appeal.

The certificate of the trial judge quotes excerpts of the record from the principal case. But these excerpts are too brief for a picture that even remotely reveals the course of the trial. The specified contempts cannot properly be appraised with a view to determining the pro-

cedure appropriate for dealing with them, unless they are given a much more balanced perspective than can be got from the certificate of contempt. In order to put the specified contempts in their trial setting, an appendix to this opinion supplements the meager excerpts in the certificate. The only adequate way to document this case would be to make the whole *Dennis* record part of this opinion, as did the trial judge by reference in his certificate. But even within the limits of space imposed by an appendix it is indubitably established that the judge felt deeply involved personally in the conduct for which he punished the defense lawyers. He was not merely a witness to an occurrence, as would be a judge who observed a fist fight in his courtroom or brutal badgering of a witness or an impropriety towards the jury. The judge acted as the prosecuting witness; he thought of himself as such. His self-concern pervades the record; it could not humanly have been excluded from his judgment of contempt. Judges are human, and it is not suggested that any other judge could have been impervious to the abuse had he been subjected to it. But precisely because a judge is human, and in common frailty or manliness would interpret such conduct of lawyers as an attack on himself personally, he should not subsequently sit in judgment on his assailants, barring only instances where such extraordinary procedure is compellingly necessary in order that the trial may proceed and not be aborted.[2]

---

[2] *Ex parte Terry,* 128 U. S. 289, presented a totally different situation and lends no support whatever to the action of the trial court in this case. As was stated in the order of commitment: "David S. Terry was guilty of a contempt of this court by misbehavior in its presence and by a forcible resistance in the presence of the court to a lawful order thereof . . . ." *Id.,* at 298. This briefly indicates the differentiating circumstances between the *Terry* case and this case. While the United States Circuit Court was sitting and one member was delivering its opinion in a pending case, Mrs. Terry in-

Summary punishment of contempt is concededly an exception to the requirements of Due Process. Necessity dictates the departure. Necessity must bound its limits. In this case the course of events to the very end of the trial shows that summary measures were not necessary to enable the trial to go on. Departure from established judicial practice, which makes it unfitting for a judge who is personally involved to sit in his own case, was therefore unwarranted. Neither self-respect nor the good name of the law required it. Quite otherwise. Despite the many incidents of contempt that were charged, the trial went to completion, nine months after the first incident, without a single occasion making it necessary to lay any one of the lawyers by the heel in order to assure that the trial proceed. The trial judge was able to keep order and to continue the court's business by occasional brief recesses calculated to cool passions and restore decorum, by periodic warnings to defense lawyers, and by shutting off obstructive arguments whenever rulings were concisely stated and firmly held to.

This, then, was not a situation in which, even though a judge was personally involved as the target of the contemptuous conduct, peremptory action against contemnors was necessary to maintain order and to salvage the proceedings. Where such action is necessary for the

---

terrupted the reading by a violent outburst. When the United States Marshal was ordered by the court to remove her from the courtroom, her husband, Mr. Terry, intervened to assault the Marshal. Upon the conclusion of the reading of the opinion, following this interruption, the court, having duly deliberated, found both Mr. and Mrs. Terry guilty of contempt and sentenced them for it. Plainly enough Terry's contempt did not touch the judges personally, nor implicate their attitude toward counsel. It involved simple physical actions in full view of the three judges. The judgment of contempt and sentencing followed promptly upon events that constituted a single brawl interrupting the actual administration of justice. See *In re Terry*, 36 F. 419; Swisher, Stephen J. Field—Craftsman of the Law, 321–341.

decorous continuance of a pending trial, disposition by another judge of a charge of contempt is impracticable. Interruption for a hearing before a separate judge would disrupt the trial and thus achieve the illicit purpose of a contemnor.

But the administration of justice and courts as its instruments are vindicated, and lawyers who might be tempted to try similar tactics are amply deterred, by the assurance that punishment will be certain and severe regardless of the tribunal that imposes it. It is a disservice to the law to sanction the imposition of punishment by a judge personally involved and therefore not unreasonably to be deemed to be seeking retribution, however unconsciously, at a time when a hearing before a judge undisturbed by any personal relation is equally convenient. It does not enhance a belief that punishment is a vindication of impersonal law; it does not fortify the deterrent function of punishment.

Had the judge here found the petitioners guilty of contempt during the actual course of the trial a different problem would be presented. Even then, however, only compelling circumstances would justify a peremptory judgment of contempt. For while "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence," the power that may thus be exercised is "the least possible power adequate to the end proposed." *Anderson* v. *Dunn,* 6 Wheat. 204, 227, 231. Resort by a judge to criminal sanctions without the usual safeguards in imposing punishment is to be supported only if the moral authority of a trial judge cannot command order and respect, only if a firm reprimand calculated to secure obedience would not halt an incipient course of misconduct.

Criminal justice is concerned with the pathology of the body politic. In administering the criminal law, judges

wield the most awesome surgical instruments of society. A criminal trial, it has been well said, should have the atmosphere of the operating room. The presiding judge determines the atmosphere. He is not an umpire who enforces the rules of a game, or merely a moderator between contestants. If he is adequate to his functions, the moral authority which he radiates will impose the indispensable standards of dignity and austerity upon all those who participate in a criminal trial.

Truth compels the observation, painful as it is to make it, that the fifteen volumes of oral testimony in the principal trial record numerous episodes involving the judge and defense counsel that are more suggestive of an undisciplined debating society than of the hush and solemnity of a court of justice. Too often counsel were encouraged to vie with the court in dialectic, in repartee and banter, in talk so copious as inevitably to arrest the momentum of the trial and to weaken the restraints of respect that a judge should engender in lawyers. Counsel were not made to understand that in a criminal case not merely the liberty of individuals is at stake. Law itself is on trial as the "stern daughter of the voice of God." Throughout the proceedings, even after the trial judge had indicated that he thought defense counsel were in conspiracy against him and were seeking thereby to subvert the trial, he failed to exercise the moral authority of a court possessed of a great tradition. He indulged them, sometimes resignedly, sometimes playfully, in lengthy speeches. These incontinent wrangles between court and counsel were punctuated by occasional minatory intimations from the Bench. As in the case of parental warnings to children, feckless repetition deprived them of authority.

To call counsel officers of the court is no idle phrase. Our whole conception of justice according to law, espe-

cially criminal justice, implies an educated, responsible, and independent Bar. Counsel are not freed from responsibility for conduct appropriate to their functions no matter what the encouragements and provocations. Petitioners must be held to strict accountability for the contempts they committed. But until the inherent authority that should radiate from the Bench is found ineffective in securing seemly conduct by counsel, there is no need for drastic peremptory procedure in bringing contemnors to book even during a trial. History records too many abuses to look indulgently upon the exercise of such arbitrary power. And when the trial in fact goes to completion, as here, without invoking summary convictions, that in itself proves that there was no occasion for departure from the historic method of trying criminal charges, that is, after notice and an opportunity for defense before a disinterested judge.

It only remains to point out the differences between this case and two other cases now before this Court on petitions for certiorari. (As to the desirable disposition of these petitions no view is intended to be indicated.) In *Hallinan* v. *United States*, 182 F. 2d 880, and *MacInnis* v. *United States*, 191 F. 2d 157, the Court of Appeals for the Ninth Circuit affirmed convictions for contempt committed by two lawyers in a trial in the Northern District of California which lasted some twenty weeks, from November 14, 1949, to April 4, 1950. The contempt charge in the *Hallinan* case was for conduct which occurred during Thursday, Friday and Monday of the first two weeks of the long trial and consisted in disobedience of the court's order to limit the opening statement and the cross-examination of a Government witness. The complained-of conduct did not at all bring the judge personally into controversy. On Tuesday morning after the time necessary for preparation of the contempt certificate the judge

found Hallinan in contempt and sentenced him to six months' imprisonment. On the face of the record it would require even more than the boldness of hindsight to say that the trial judge could not have reasonably believed that immediate vindication of the disobedience of the court's order was necessary to secure respect for his authority during the remainder of the trial.

Later, on February 1, 1950, the other defense attorney— MacInnis—thus addressed the court after one of its rulings: "I think you should cite yourself for misconduct. . . . I have never heard anything like that. You ought to be ashamed of yourself." Soon after this remark the court recessed until the next day. After overnight consideration, the judge informed the lawyer that his remark constituted contempt and that a certificate of contempt in accordance with Rule 42 would be filed. Here again, the judge took prompt action in order, as he concluded, to assure the orderly continuance of a trial which still had many weeks to go.

The *Hallinan* and *MacInnis* cases disprove the Government's claim that prompt citation for contempt, if the circumstances warranted it, would have caused delay and disruption in the New York trial. In the California case Hallinan remained as defense counsel by virtue of a stay in the execution of his sentence; and MacInnis, by a postponement of his sentence until after the verdict in the principal case. MacInnis evidently abstained from further misconduct in the principal trial because of the certainty of punishment, though he did not know its magnitude. Either device was available to the trial judge in New York had he felt that only by a prompt judgment of contempt could he keep control of the proceedings. In fact he did keep order by measures short of those used in the California case. At the end of the trial the only question was whether he or another judge, not personally involved, should pass on issues of contempt that had

arisen during a trial that had ended, and impose punishment if guilt was found.

It is suggested, however, that a judge should be allowed to punish contempt peremptorily, as did the judge here, long after the contempt occurs. Otherwise he might be impelled, so it is surprisingly argued, to act on the inflamed impulse of the moment for fear of losing the opportunity to punish the offender himself. The *Hallinan* and *MacInnis* cases suggest the answer: power to cite for contempt summarily is not lost by taking a reasonable, brief time for judicious consideration whether such drastic action is necessary in a pending trial. Moreover, the guides to right conduct which Mr. Chief Justice Taft laid down in the *Cooke* case, and on which I rely, rest on the assumption that federal judges are not undisciplined creatures whose feelings are their masters. Presumably they are responsible beings with cool heads. In any event, this Court sits to correct a rare occurrence of irresponsible action. Finally, the Government urges that a hearing before a different judge would give petitioners another opportunity for harassing tactics, and that to subject the trial judge to cross-examination and refutation by witnesses drawn from court-room spectators would embroil the federal judiciary in damaging controversy. Once more the Government depreciates the status of federal judges. It derogates from the high conception which one should have of them not to attribute to the judge who would preside in the contempt hearing those capabilities by which federal judges, especially in non-jury cases, conduct proceedings in an effective, expeditious and dignified manner, with appropriate control over the scope of cross-examination and the offer of witnesses.

Public respect for the federal judiciary is best enhanced by exacting high standards of judicial competence in the conduct of proceedings and by discouraging an assertion

42

of power which is not restricted by the usual demands of Due Process and which too often manifests a failure of moral mastery.

APPENDIX TO OPINION OF MR. JUSTICE FRANKFURTER.[1]

EXCERPTS FROM THE RECORD OF THE PRINCIPAL CASE, DENNIS *v.* UNITED STATES.

The Court: Well, if you think I am going to conduct an inquiry as to the reasons why everybody is in each one of the seats here you are making a big mistake, because I am not going to do that. There are lots of people here who came for reasons that are sufficient for themselves.

Mr. Gladstein: I understand, but your Honor will certainly permit me to call your Honor's attention at least to the facts that I want to complain about, even though I am told that your Honor is not going to do anything about it. And you will permit me, will you not, your Honor—

The Court: You know, Mr. Gladstein, I don't like that crack. I don't know who told you that I am not going to do anything about this or that. (Pp. 72–73; Jan. 17, 1949.)

\* \* \* \* \*

Mr. Gladstein: I think Mr. Sacher was referring to the question of the hours that you want to sit today, the

---

[1] Since the whole certificate of contempt was published as an appendix to the opinion in the Court of Appeals and is readily available, 182 F. 2d 416, 430–453, there is here not reproduced any part of the record which has already been quoted adequately in the specifications of the certificate. Each specification should be examined in connection with this Appendix, at the appropriate point indicated herein. Each specified episode involving contemptuous conduct should be placed in the trial setting as shown by the further excerpts reproduced here from the whole record.

The page references are to the printed record before this Court in *Dennis* v. *United States,* 341 U. S. 494.

time. That is why he asked. I was getting a little hungry myself. And you look a little peaked I think.

The Court: If I felt any stronger than I do right now I would be sick. So don't worry about my looking peaked, I feel all right. (P. 88.)

\* \* \* \* \*

Mr. Gladstein: . . . Standing behind me here are two men who are attaches of this court, they are bailiffs.

The Court: But they are always there, at every criminal trial.

Mr. Gladstein: Your Honor, you haven't heard me yet. I have no objection, precisely.

The Court: If I seem impatient to you I am sure it is a very misleading impression.

Mr. Gladstein: I will accept that, your Honor, with what I think you intended to convey. (Pp. 146–147.)

\* \* \* \* \*

The Court: . . . I think you have squeezed all the juice out of that particular orange.

Now, why don't you get on to the merits of your claim that the judges here should not try this issue.

Mr. Gladstein: If you would permit me, your Honor, to carry forward a little bit the allusion that you have just made, which happens to be closely identified with the State from which I come, from which the citrus fruits are a product—

The Court: No Californian ever misses the chance. (Pp. 207–208.)

\* \* \* \* \*

The Court: If you mean that as applicable to me, I say I don't know anything about it. I don't. I haven't the remotest idea how these juries are got together. I have only been on the bench here as you know a short time.

Mr. Gladstein: How long has it been, your Honor?

The Court: Well, July 1st, 1947, was the great day, as I remember it.

Mr. Gladstein: Well, that is over a year and a half. (P. 212.)

* * * * *

Mr. Gladstein: But what happened about ten years ago was that it was decided to throw that system into the ashcan, so to speak, and to substitute for it a system which is the opposite of democratic, fair, truly representative; and this is what took place, as our affidavits show: instead—well, first of all—

The Court: Now all this time I am thinking, where is the bias? Where is the prejudice? What kind of a judge must you have specially? I am think[ing] about that, and doubtless you have got it in mind.

Mr. Gladstein: I certainly have, your Honor.

The Court: Don't creep up on it too suddenly. (Pp. 238–239.)

* * * * *

Mr. Gladstein: . . . You as a practicing attorney stood before the Supreme Court of the United States and spoke about the necessity of having a democratic jury system in the State of New York.

The Court: And as I understand it the fact that I then fought for a democratic jury system shows now that my mind is so biased that I am not fit to sit here and hear your case? That seems a little inconsistent to me.

Mr. Gladstein: If your Honor please, please don't distort the meaning of what I say, because what I am saying is: the fact that 18 months ago or thereabouts your Honor stood before the Supreme Court demanding that it condemn an illegal, vicious kind of jury system in the State courts, plus the fact that for 18 months your

Honor has sat on this bench in the Federal courts and has seen in operation a system which to the naked eye reveals the kind of discrimination and exclusions that have been taking place and your Honor has done nothing about it.   (P. 242.)

\* \* \* \* \*

The Court:   Mr. Dennis has a little suggestion for you there that Mr. Sacher is looking at.   I think he means to give it to you.

Mr. Sacher:   No.   This is a private communication. Thank you.

The Court:   I had no idea of desiring to see it, Mr. Sacher.

Mr. Sacher:   Oh, I understand that.

The Court:   I thought he intended it for Mr. Gladstein and I attempted to do what I thought was a courteous thing in calling his attention to it.

Now, please, don't try to misunderstand things like that.   You may assume that when I say things I say them in good faith.   I have no desire to do otherwise, and I think you gentlemen will do better to recognize that.

Mr. Sacher:   I don't like to get the feeling that the clients are under the surveillance of the Court.

The Court:   Well, all right.   I am sorry that you take it that way.   (P. 244.)

\* \* \* \* \*

Mr. Gladstein:   The key to the difference between what you have just said, your Honor, and what I am contending is a little magic phrase consisting of four words that you slipped into that last statement.   I think it was "regardless of the justification"—

The Court:   I don't think you ought to say "slipped in" now.   I gather you meant that colloquial expression in a nice way.

Mr. Gladstein: Oh yes. Everything I say to the Court is always meant in a nice way, your Honor.

The Court: I know. (P. 247.)

\* \* \* \* \*

Mr. Sacher: . . . I heard your Honor say a few minutes ago that the witness did not look like a banker.

The Court: No, I said he did not look like a mechanic.

Mr. Sacher: Oh, I beg your pardon. All right.

Now, the point I want to get at is this, that what the decisions of the Supreme Court are concerned with are not the appearances, for I have seen many workers and mechanics who look a darn sight more handsome and more personable and pleasant than a lot of fat bankers.

The Court: Well, we won't go into the question of how good-looking everybody is. We might not come out so well on that.

Mr. Sacher: That may be. (P. 383.)

\* \* \* \* \*

(*Conduct involved in Specification II* [2]*—pp. 384–385; Jan. 21, 1949.*)

\* \* \* \* \*

Mr. Sacher: Well, I don't think you would have called him if you had anything to do with the trial. You were too good a lawyer to do any such thing.

---

[2] Since Specification I charged generally "a wilful, deliberate, and concerted effort to delay and obstruct the trial," Specification II charges the first specific act of contempt in the principal trial. See 182 F. 2d at 431–432. The portions of the trial record reproduced in the specifications of the contempt certificate give, because of their brevity, only a mutilated picture of the trial. The places in the record where the alleged contempts occurred are indicated in order that each incident of contempt may be viewed in relation to the record excerpts set forth here.

The Court: Well, it is quite flattering to have you keep talking about me as a lawyer, and I am glad to hear your comments on the subject as long as they are favorable. And if not I will preserve my equanimity in any event. (P. 399.)

\* \* \* \* \*

The Court: You can reopen the matter of consideration when I hear from Mr. Isserman who doubtless is about to add something of importance in just a moment.

Mr. Isserman: I object to your Honor's remark. I think it is sarcastic. It doesn't show the respect that this Court should show to counsel. I object to it.

The Court: Well, I intended no disrespect to counsel. I will listen to what you have to say.

Mr. Isserman: I once more object to your Honor's ruling on matters affecting the clients I represent in this proceeding before hearing my position in respect to those matters. (P. 404.)

\* \* \* \* \*

Mr. McCabe: . . . Just take, for instance, an employee of the McGraw-Hill Company. The fact that he got a salary somewhat less than $5,000 I do not think would put him in the class of those whose economic outlook or whose economic philosophy would be at variance with that expressed by that of his employer. An employee of the National Association of Manufacturers might very well be drawing a salary which would, under the arbitrary rule which we are just toying with here— I don't say we are setting it up arbitrarily, but we have tried to come around—

The Court: You are certainly toying with it all right.

Mr. McCabe: Well, maybe it will be like my grand-child—when she toys with toys there isn't much left of the toys after about ten minutes.

The Court: Well, I seem to be surviving all right. (Pp. 428–429.)

* * * * *

The Court: . . . After all this [is] not the trial in chief. This is the preliminary challenge, and the situation is a little bit different. I suppose I should take it under advisement. I do not want to act hastily about it. I must say that my study of this record in this interval has indicated to me, has for the first time put in my mind the thought of a series of concerted and deliberate moves to delay the case. I am exceedingly reluctant to take the view that any lawyer would do that, and even press by this occurrence this morning—

Mr. Sacher: I would like to deny that we have ever done it or that we are doing it now, your Honor.

The Court: I have put that thought from my mind for the present, but I will say that it is a rather difficult situation that has been brought up here by the conduct of counsel. (P. 465.)

* * * * *

Mr. Crockett: . . . I think the Court is aware that my arguments are usually pretty short and to the point, though I must confess they have not been any too convincing to your Honor—

The Court: Yes, much better than Mr. Sacher and Mr. Isserman who have been—well, shall I say, prolix and vociferous and repetitious, but all in good taste, and I have listened, although I must say, as I said a few moments ago, that the thought has finally entered my mind that all this business that has been going on is just a series of wilful and deliberate maneuvers for delay.

Mr. Sacher: I resent that and I want to deny it once again. (Pp. 467–468.)

* * * * *

Mr. McCabe: Your Honor told us to saw wood the other day.

The Court: Yes.

Mr. McCabe: And it seems to me that the sawdust is getting in somebody's eye. We are sawing wood a little bit too rapidly.

The Court: If you mean by that that you have perhaps got me in an ill humor, you are entirely mistaken, because I feel very pleasant and genial, and I have no desire or no thought of feeling disturbed at all; so if you meant by your comment that my attitude was perhaps changed or different, I think you are mistaken.

Mr. McCabe: I did not infer that at all, your Honor.

The Court: What did you mean?

Mr. McCabe: What I said, that the sawdust was getting in somebody's eyes?

The Court: Yes. Whose eyes were you talking about?

Mr. McCabe: I say the eyes of anybody who is interested in defending a system of selection of jurors which is as we claim it to be. I will say this, your Honor—

The Court: But you did not mean my eyes, I take it, did you? You could either say yes or no. Now which is it?

Mr. McCabe: Well, when sawdust starts flying around I guess it gets in everybody's eyes.

The Court: So you didn't mean me?

Mr. McCabe: No, I will say I did not. I will say this: Your Honor, if I walked into this courtroom and told you that the legs of that chair you are sitting on were cracked and were about to fall, or if I said that this wall had a big crack in it, and that the whole system looked bad—

The Court: It wouldn't scare me.

Mr. McCabe (Continuing): If I said to your Honor that perhaps there were other serious things wrong with this courtroom, just the physical aspects of the court-room, I think that I am not far off in assuming that your Honor would cause the fullest investigation to be made to see that the physical safety, not of yourself—

The Court: That is where you are making a big, 100 per cent mistake. It would roll off my back like water off a duck, and I would not even look at the legs of the chair. (Pp. 573–574.)

\* \* \* \* \*

Mr. McCabe: That is not regulating the order of proof, your Honor, when just as it looks, as everybody realizes, that the initial proof absolutely supports our assertion then suddenly we are cut off and shunted on to some other way; that our orderly procedure and ex-peditious procedure in proving our case is suddenly dis-rupted by your Honor's ruling. I say it certainly indi-cates some fear on your Honor's part.

The Court: Well, I have no fear. If you have any impression that I am afraid you may put that out of your mind entirely, because I have not felt any fear, and I can only remember once in my life that I was afraid, and I am not accustomed to be afraid, and I am not afraid now. So you can just drop that subject. If you want to know what that one time was that I was afraid, I will tell you sometime.

Mr. McCabe: Your Honor picks up the word "fear." I would like to get back to the word "bias," then. (P. 582.)

\* \* \* \* \*

The Court: You have a curious way of expressing yourself, to say the least.

Mr. Sacher: Perhaps that may be so, your Honor, but unfortunately I can express myself in no other way. And I would like, if your Honor would be kind enough to indulge me to refrain from personalities so that I may develop what I regard as a most important argument on this question,—

The Court: You ask me to refrain from personalities?

Mr. Sacher: I think so. You have just accused me—

The Court: For what purpose? I indulged in no personalities.

Mr. Sacher: You said I have a curious way of expressing myself.

The Court: Yes. You said the United States Attorney had confessed his guilt. I considered that—

Mr. Sacher: I did not use those words. I said he made a confession of guilt and I stand by that statement.

The Court: Well, that is no personality. That is a comment on a sort of argument that I think is out of place and not helpful.

Mr. Sacher: All right. (P. 607.)

* * * * *

The Court: . . . But you have made so many challenges of bias and prejudice and said that every time I ruled against you there is something about it that is abnormal, so I have been disposed to let you go on. But I think the record has indicated an amount of repetition that is utterly unprecedented.

Mr. McCabe: Your Honor, when the demonstration of the bias is repeated the objections to it must [by] necessity be repeated.

The Court: Well, you may, as I said before, you may challenge my bias and prejudice just as often as you think you should.

Mr. McCabe: We shall, your Honor.

The Court: I take no umbrage at that. But I should think that you had covered that ground pretty well. (Pp. 612–613.)

\* \* \* \* \*

The Court: Well, so many things have happened that seem, as I read back over that record, hardly consistent with anything other than a concerted and deliberate and wilful effort to delay. But I have told you that the thought merely occurred to me and I have put it out of my mind for the present. I wouldn't want to have something come along later and have anyone fail to understand that there is this interpretation of what has been going on. I do not say it is the right interpretation; it may well not be. And all I do say is that the thought for the first time came into my mind and I put it out.

So we adjourn now until tomorrow morning at 10.30.

Mr. Sacher: I want to state on the record, however, that I deny what your Honor said.

The Court: You don't need to shout, Mr. Sacher.

Mr. Sacher: No. I resent—

The Court: It is possible to address the Court occasionally without shouting.

Mr. Sacher: Yes. Your Honor in a quiet manner is picking out a point which will result in certain headlines tomorrow morning. For the record I want to make it clear that I have done nothing and will never do anything to delay or hinder the progress of this case. And whatever I or any other counsel in this case have done or has done has been directed solely to the achievement of the end of proving that this jury system is bad.

And I think, your Honor, that there is no justification for closing every day's session with the observation as to what thought was entering your Honor's mind concerning our state of mind. (P. 623.)

\* \* \* \* \*

The Court: Now a little incident occurred this morning about which I will have no mystery. Due to the numerous communications of one kind or another that have been arriving up at my home my wife came down here this morning. I suppose I should have told her not to, and it is my fault, but she did. And, then, there was a little disturbance here due to a woman who saw the empty seats over on the side where the press have their location and she felt she was entitled to go there and made a little, slight disturbance with the bailiffs. And so my wife sent this note to the police which reads, "Tell Detective Mitchell to guard the Judge at lunch hour." And as the messenger proceeded with the note one of the alert reporters was able to get a hold of the note, and so the rumors started around the building, and goodness knows where else they have gone.

As to the woman who desired to sit on the other side where the empty seats are, I noticed the matter and I sent a little communication of my own to the bailiffs to tell them to leave her alone. I thought she was right. I saw her during the recess hour in my chambers, and I told her that I thought she was right, and that while those members of the press were not occupying the empty seats perhaps it was only reasonable to have the last row at least made available to those who were waiting to get in.

Now, that is all there is to it. There is no mystery. There is no danger. I haven't felt the slightest concern about the communications I have been receiving. And there it is.

I have no notion that any of those communications have been inspired by the defendants or by any of their counsel. I do not feel that I am in any personal danger at all. But if I am wrong, I shall face the risk calmly and I shall do my duty.

Now I think perhaps it is apparent to everyone that the character of the accusations that have been made against me here from day to day and the extravagant charges that have not only been made once or twice but repeatedly and emotionally and loudly may well cause some misguided and poor people or others to get a wrong impression of the administration of justice and of what I am doing. I have no great opinion of myself as an individual. I do have great respect for the office which I hold. I represent here not the rich, not the poor, but all the people and the majesty of the Government of the United States. And I am cognizant of that and I am trying to do the best I can, to be just and to be fair according to my lights. I may make mistakes, I suppose I often do, but I can only do my best.

You may proceed with the trial.

Mr. Sacher: If the Court please, I think we too, both the defendants and defendants' counsel, have received a series of letters with threats of violence against ourselves, our wives and our children. Indeed, when I returned to my home at one o'clock this morning my wife greeted me, not with a note to a detective, but with several letters.

I might in passing say that your Honor may have received crank notes. I am sure that they were not inspired by anything we said or did. And in that connection I may say that so far as the defendants are concerned they have received much more than crank notes. You will recall that in one of the arguments I pointed out—

The Court: I am glad you can tell the difference—

Mr. Sacher: Will your Honor—

The Court: I am glad you can tell the difference between a crank note and others. But I am not disposed to have argument about everything.

Mr. Sacher: I know, your Honor.

The Court: May we not even pass this incident without extended discussion? (Pp. 664–665.)

\* \* \* \* \*

Mr. Sacher: Mr. Gladstein, now we can't hear you.

The Court: Now (that [sic] is a strange accusation, Mr. Gladstein, because your voice is very penetrating and pleasant.

Mr. Sacher: Why, your Honor, I must say, however, that I did not hear Mr. Gladstein. He was speaking so softly.

The Court: I don't doubt it. That is all right.

Mr. Gladstein: Perhaps the newspapers should take note. They have been saying that I am very loud and brash, and so forth, but it does not really matter to me personally, your Honor.

The Court: No, we must not worry about what the newspapers say about it.

Mr. Gladstein: There would be very little to entertain us if we took too seriously what some of them say.

The Court: You know, I have often felt, as I have often expressed myself here, that it is better not to be stuffy. I try not to be.

Mr. Gladstein: All right. (P. 667.)

\* \* \* \* \*

The Court: Now, Mr. Gladstein, I know all about leading questions, and when the Court in his discretion will allow them, and when he won't. Now you go ahead and lead him as little as necessary.

Mr. Gladstein: I don't have to lead him at all, and I won't, your Honor.

The Court: That is all right. It is just not to get into an unnecessary argument about it. Because I know plenty about leading questions. I have probably tried a few of them myself in my day. (P. 714.)

\*　\*　\*　\*　\*

Mr. Sacher: . . . we shall ask for and insist upon the time necessary to explore those records in order—

The Court: I wish you would not use that expression "insist upon."

Mr. Sacher: That means urging, that is all.

The Court: You know, you use it all the time.

Mr. Sacher: I don't do it all the time. I think the record should indicate that "all the time" to your Honor in this instance means once.

The Court: Perhaps when I used the expression "all the time" I used it in a rhetorical sense. But, anyway, I would like to have you understand that you will insist upon nothing.

Mr. Sacher: Well, we will urge that.

The Court: I will rule what is to be done. (P. 884.)

\*　\*　\*　\*　\*

Mr. Sacher: I have just one observation to make, your Honor, concerning delay. While speed is a very commendable objective, I think justice is a greater one, and that if it be—

The Court: Well, it is nice to have you remind me of that.

Mr. Sacher: What is that, your Honor?

The Court: I say, it is nice to have you remind me of that. (P. 885.)

\*　\*　\*　\*　\*

Mr. Gladstein: . . . Now it seems to me very plain that Mr. McGohey is here toying with possibilities. This witness or other witnesses—

The Court: Well, he has got some competition in that.

Mr. Gladstein: Well, we are not going to let him toy. We are very serious about this.

The Court: Oh, well, I know.

Mr. Gladstein: We are quite serious.

The Court: You take over the courtroom any time, but I am here running the court, so don't say, as you and Mr. Sacher are apt to do: you insist on this and we are going to do this. You are going to do what I tell you to.

Mr. Gladstein: Well, I am going to remain serious, regardless of what your Honor tells me.

The Court: That is right. (Pp. 931–932.)

\* \* \* \* \*

(*Conduct involved in Specification III—pp. 933–934; Feb. 2, 1949.*)

(*Conduct involved in Specification IV—pp. 1034–1038; Feb. 3, 1949.*)

\* \* \* \* \*

Mr. Gladstein: . . . Now, although everybody, one would think, who did not prejudge the matter here—

The Court: Well I deny the motion to disqualify me.

Mr. Gladstein: Well, you were anticipating. I wasn't going to make one.

The Court: I am very quick to catch on, and I thought when you said "anybody who does not prejudge," it was just another way of telling me again what you have told me so many times, and your colleagues have told me so many times: that I have prejudged it all; that I am

biased and prejudiced and unfit to sit here. Now, I am familiar with that, and if you think you are going to get me excited saying that over again, you are making a big mistake.

Mr. Gladstein: I wasn't going to say it over again, and if I were it would not be for the purpose of getting you excited. It is true I have a definite mind on the question of whether legally you are disqualified, whether you are biased, but I wasn't going to express it.

The Court: They went all the way up to the United States Supreme Court with it, and I suppose if there was any further you could go, you would do that.

Mr. Gladstein: They didn't pass on your Honor's bias. — They did not say you were unbiased—

The Court: They denied the application for certiorari.

Mr. Gladstein: Yes, they refused to hear the question of whether or not you were biased, that is true, but that does not mean, your Honor, that they passed favorably on the contention of the Court. It does not mean, of course, that they held that you were biased, but neither does it mean that they held you were unbiased.

The Court: Well, you don't really need to keep rubbing it in and telling me every day that I am prejudiced, biased, corrupt, and all that sort of thing, because after a man has been called names a certain number of times they have no effect on him any more. (Pp. 1034–1035.)

\* \* \* \* \*

(*Conduct involved in Specification V—pp. 1049–1059; Feb. 3, 1949.*)

(*Conduct involved in Specification VI—pp. 1085– 1092; Feb. 4, 1949.*)

\* \* \* \* \*

The Court: Well, you see, you and your colleagues have apparently adopted a new technique in criminal

cases by which instead of the defendants who are indicted being tried, the Court and all the members of the court are the ones who must suffer the excoriations and accusations of counsel. But I think, perhaps, with patience there will be an end. So you will please let the matter drop there, and Mr. Isserman will proceed with his questions.

Mr. Isserman: I will proceed, your Honor, but I am again constrained on behalf of my clients to object to your Honor's remark characterizing the questioning which I am indulging in, or suggesting that the questioning is a stalling and delaying tactics, and to the description of this challenge to a jury, which under the law we have a right to make on behalf of our clients, as a new technique— (Pp. 1090–1091.)

\* \* \* \* \*

The Court: Well, perhaps we had better let each one of the counsel for the defendants say a word or two now, because they look as though they desire to state their positions too.

Mr. McCabe, would you like to say something?

Mr. McCabe: I had not intended to say anything, your Honor, but as long as your Honor invites it I would like to express a thought that has been going through my mind for several days: (P. 1091.)

\* \* \* \* \*

The Court: It might be prejudice, I suppose?

Mr. McCabe: No, it has become clear to me that your Honor is doing the very same thing. Your Honor by constantly referring to our tactics as delaying tactics; by referring to evidence which seems to me to be very clear and precise, as being confusing, and referring to gaps in the testimony—I think that your Honor seems to have in his mind doing the very thing which you, I think un-

justly, indicated that we might be doing. It seems to me that your Honor's words, that constant repetition of our new techniques and delaying tactics, and dragging things out and rambling on, that that is addressed—

The Court: Well, maybe I do ramble a little now and then, but I think that may be the privilege of the Court. (P. 1092.)

\* \* \* \* \*

(*Conduct involved in Specification VII—pp. 1134–. 1141; Feb. 4, 1949.*)

\* \* \* \* \*

Mr. Gladstein: Thank you, your Honor.

I have just pulled out a random—something that the clerk in this court does not do when he picks jurors—two—

Mr. McGohey: I move to strike that, your Honor.

The Court: I did not even hear that part. I hope it wasn't anything good. (P. 1569.)

\* \* \* \* \*

Mr. Isserman: I am sorry, I object to your Honor's remark again. It is wholly uncalled for.

The Court: You may do all the objecting you want, but I am running this court and we are not going to have this interminable delay. (P. 1574.)

\* \* \* \* \*

(*Conduct involved in Specification VIII—pp. 1660–1671; Feb. 14, 1949.*)

\* \* \* \* \*

The Court: Mr. Sacher, you are becoming positively insolent.

Mr. Sacher: Well, I am not. I am stating—

The Court: Now I won't have it.

Mr. Sacher: I am stating what your Honor seems—

The Court: You have charged me with about everything that a lawyer can charge a court—

Mr. Sacher: I am making no charge—

The Court: You are charging me by this innuendo of some sort of connivance with the United States Attorney, and I just will not have any more of that. (P. 1661.)

\* \* \* \* \*

The Court: Mr. Gladstein, I hope I am misunderstanding the purpose of that comment. It does not seem to me that you needed to do it. It seemed to have just one of those little fishhooks in that you so often sprinkle in your conversation, and I suggest that you omit them, if possible.

Now, you have been allowed every reasonable latitude here, and it is my intention to give you every reasonable latitude to bring out whatever you want to bring out—

Mr. Gladstein: Very well.

The Court (Continuing): But I cannot continue to do it indefinitely, and if I get the impression that sarcastic comments and criticisms of the Court by innuendoes are being dropped in here and there, it is perhaps going to affect my discretion somewhat in the rulings I make on the extent of your cross-examination. (Pp. 1813–1814.)

\* \* \* \* \*

The Court: Do you wish to make a motion that I disqualify myself for prejudice, as you have already made?

Mr. Crockett: I want to reserve the right to make such a motion, your Honor.

The Court: You have made it, I suppose, you and your colleagues, I don't know how many times, and I

62

think we all understand that you charge I am biased and prejudiced and corrupt and everything else. (P. 2094.)

\* \* \* \* \*

*(Conduct involved in Specification IX—p. 2097; Feb. 18, 1949.)*

\* \* \* \* \*

The Court: Of course, you abandoned all thought of that, you and your colleagues, long ago here because you charged me again and again with corruption, bias, prejudice and having something to do with the system that I had nothing to do with. So I understand thoroughly what you think about me. Now, I can't help that. I must do my duty as best I can. So if you want to go on and call me some more names, go ahead and do it. It may come within part of your duty as you see it, and certainly it would be relevant to the case, and I am not going to stop you, so go right ahead and call me anything you want. (P. 2098.)

\* \* \* \* \*

Mr. Gladstein: . . . That the Court is not concerned with the consumption of time is evident from the fact that during the past 35 or 40 or 45 minutes, perhaps longer, as each of the four attorneys who preceded me attempted to present his statement of objections, the Court constantly and frequently interrupted for the purpose of—

The Court: If you expect I am going to sit here like a bump on a log while they make statements that are absolutely not so, I can tell you now I won't do it.

Mr. Gladstein: I desire—

The Court: There is no rule I ever heard of that a judge is supposed to sit silent while the attorneys flay him.

Mr. Gladstein: I desire to make an orderly, logical presentation of what I have to say,—

The Court: Go ahead and do it. (P. 2099.)

\* \* \* \* \*

Mr. Gladstein: Your Honor, I would like to finish my statement for the record. I wish the record to show my objection to the tone and the manner in which the Court delivered that command as unbecoming a Court, and I object to it. I also—

The Court: There is nothing unbecoming about it. I am through being fooled with in this case.

Mr. Gladstein: Now, if your Honor please—

The Court: If you don't like it you can lump it. Put that down.

Mr. Isserman: I object to your Honor's remark and characterization of the conduct of counsel, and I ask that your Honor strike that remark.

The Court: Oh yes, yes, I have heard all that. Now I am sick of it.

Mr. Gladstein: Now I wish to add to my objection the unseemly remark of the Court saying that if we do not like it we could lump it. I object to it and ask the Court to withdraw and strike that statement from the record.

The Court: Yes, I refuse—I deny the motion. (Pp. 2276–2277.)

\* \* \* \* \*

(*Conduct involved in Specification X—pp. 2383–2385; Feb. 28, 1949.*)

(*Conduct involved in Specification XI—p. 2404; Feb. 28, 1949.*)

\* \* \* \* \*

Mr. McGohey: Well, it is a dishonest question, your Honor, and that is the basis of the objection to it.

The Court: It is in Mr. Gladstein's best style. (P. 2490.)

\* \* \* \* \*

*(Conduct involved in Specification XII—pp. 2528–2529; March 1, 1949.)*

\* \* \* \* \*

Mr. Gladstein: . . . I desire the right, and I request the Court to grant it, for us to have an inventory made of the contents of those envelopes before they are taken from us permanently. We will also ask leave at times, suitable to the Court, to make copies of those—

The Court: Do you realize, Mr. Gladstein, you are insinuating that I have possession of those exhibits and will destroy some of them?

Mr. Gladstein: I make no such insinuation. (P. 2556.)

\* \* \* \* \*

Mr. Sacher: . . . There is really nothing funny about this.

The Court: I was just thinking it was only a little while ago you were talking about Judge Knox's book in a rather different way. But you can do that. That is all right.

Mr. Sacher: But this is a statement of fact.

The Court: I am not going to stop smiling when I see some occasion to smile just because Mr. Sacher does not like it.

Mr. Sacher: It is not the smile. I welcome smiles. I indulge in them a good deal, but I don't think you ought to treat this argument with levity because I think it is an important question. (Pp. 2640–2641.)

\* \* \* \* \*

The Court: . . . We will then, by the usual process of selecting names out of the wheel, put 12 jurors in the

jury box, but the questions will be not only to them but to the others who may be sitting in the courtroom. Otherwise the repetition of the questions will be such as to utterly wear me out, or anyone else under the circumstances, and be utterly unnecessary. (P. 2665.)

\* \* \* \* \*

The Court: Well you know, it seems so easy for the Court to send a letter. My pre-occupations now are such that I simply could not do it. It is hard for people to realize the burden that I have been carrying here and the many details of one kind or another that I have to take care of, and I don't think it would be proper for me to do it anyway, but the main question is whether there would be some special hardship to you. (P. 2707.)

\* \* \* \* \*

Mr. McCabe: I just want to give you the citation. It is Farnsworth vs. Sanford in [115] Fed. (2d) 375.

The Court: Thank you. Let me glance at this, but I can tell you all that I am not going to dash off any determination on some question of law by glancing at a case or two on the spur of the moment. I don't like to see judges do that and I don't do it myself. I have tried here to give every question that comes up careful consideration, and that has been one of the things that has been wearing me out here because I have been getting propositions of law in rather close proximity to one another. (P. 3121.)

\* \* \* \* \*

Mr. Sacher: It is very strange that on the occasions when you scratched your head and pulled your ear, we were speaking and not Mr. McGohey.

The Court: Maybe you were not watching me.

Mr. Sacher: I just want to say that your conduct at all times—you see, you are doing it again.

The Court: I know, you are going to say I am corrupt and I am disqualified. You called me all those things before. Now you can run the catalogue again and I will listen patiently. Make it just as bad as you can.

Mr. Sacher: Your Honor, I am certainly aware of the fact that if I bear false witness against your Honor in anything I have said that I am subject to disciplinary measures and I am not inviting disciplinary measures by making false statements.

The Court: You mean that I will take disciplinary measures against you because you said I scratched my head? Don't be absurd, Mr. Sacher. Don't be absurd.

Mr. Sacher: The point I am making is that in every available means your Honor is conveying to the jury your lack of sympathy if not hostility to the defendants, their counsel's presentation of the case, and in these circumstances I want certainly to note on behalf of my clients a vigorous objection to your Honor's conduct and I wish to join Mr. Gladstein in the motion to declare a mistrial by the withdrawal of a juror.

The Court: Motion denied. (Pp. 3316–3317.)

\* \* \* \* \*

Mr. Gladstein: . . . There is nothing unusual about that request and we make it, and we ask the Court to really give some consideration to it.

The Court: You know, that word "really," there, that is the way you do. You put that little sly insinuation in, as much as to say that heretofore I haven't really given the matter any consideration. (P. 3332.)

\* \* \* \* \*

Mr. Gladstein: I move that the remarks you have just made concerning the enjoyment—

The Court: I see them smiling, sneering and snickering there. The jury undoubtedly sees it as well.

Mr. Gladstein: Just a minute. If your Honor please, I assign those remarks as prejudicial misconduct on the part of the Court. I assign as misconduct your refusal to permit me to make an objection.

The Court: When did I refuse?

Mr. Gladstein: By your interruption at the present time and by pyramiding the misconduct which I am assigning. I ask the Court to instruct the jury—

The Court: You are now told that you may go ahead and make your remarks in extenso. (P. 3769.)

\* \* \* \* \*

(*Conduct involved in Specification XIII—pp. 3942–3943; April 4, 1949.*)

\* \* \* \* \*

Mr. Gladstein: Your Honor, I am allowed, am I not, to assign as misconduct remarks of the Court that, as a lawyer, I think constitute misconduct?

The Court: You may attack me all you want.

Mr. Gladstein: That is not what I said.

The Court: You may claim that I have been guilty of judicial misconduct of every name, nature and description, that is your right—and I shall take no offense at it.

Mr. Gladstein: I object to the Court's remarks and assign the Court's last remark as misconduct.

The Court: Very well. (P. 4028.)

\* \* \* \* \*

*(Conduct involved in Specification XIV—pp. 4058–4059; April 5, 1949.)*

\* \* \* \* \*

Mr. Crockett: I must object to that statement, your Honor, as suggesting to Mr. Gordon how he can get what he seems to be troubled about getting out of this witness.

The Court: Mr. Crockett, it is the function of the Court here to administer justice which I am trying to do to the best of my ability. Now you must know that such comment as you just made is not right.

Mr. Crockett: But I think the Court appreciates the fact—

The Court: Now I have been standing for all kinds of picking on me by the lawyers for the defense here and I am not going to raise any great issue about this one, but I really—I really think if it gets to a point where the Judge may not indicate what he thinks is the proper thing to do, it has reached a strange and pitiful state of affairs. (P. 4177.)

\* \* \* \* \*

*(Conduct involved in Specification XV—pp. 4228–4229; April 7, 1949.)*

\* \* \* \* \*

Mr. Gladstein: May I call your Honor's attention to the fact that because you just took umbrage at an objection which Mr. Isserman made as a lawyer—

The Court: I took no umbrage.

Mr. Gladstein: —you then reacted—

The Court: I suppose you begin—

Mr. Gladstein: May I finish, your Honor?

The Court: —to talk about my inflection of voice—

Mr. Gladstein: No, I am not talking about your inflection.

The Court: But I am not taking any umbrage at all.

Mr. Gladstein: But, your Honor—

The Court: But I am not going to have a long-drawn-out discussion of something that is perfectly clear to me. (P. 4403.)

\* \* \* \* \*

Mr. Gladstein: I assign your Honor's handling of my objection as misconduct.

The Court: I am getting used to these charges of misconduct. I don't think there has ever been a case where so many charges of misconduct have been made with so little foundation. (P. 4622.)

\* \* \* \* \*

(*Conduct involved in Specification XVI—pp. 4787–4788; April 19, 1949.*)

\* \* \* \* \*

Mr. Gladstein: I ask your Honor to strike that evidence, and I will also assign, as I did before, your Honor's statement as misconduct because it gives the impression that there is some possible relationship, which there cannot be, between this kind of statement and the charges in the case.

The Court: How can I rule that the evidence is inadmissible without necessarily giving the inference that it has a bearing on the case. And every time a Judge rules that way, the doctrine that you gentlemen have developed here is that that is judicial misconduct. Now I can't stop lawyers from calling me names and saying I am guilty of judicial misconduct and that I am prejudiced,

and this, that and the other thing, and you can keep that up until the cows come home; that is all right, and I take no umbrage at it.   (P. 4799.)

\* \* \* \* \*

The Court:   Why all of the defendants are smiling broadly.

Defendant Gates:   Why certainly we are.

Defendant Potash:   Certainly we are.

The Court:   We are getting back to that country club atmosphere again.   Well, there isn't going to be any country club atmosphere in my court.

Mr. Gladstein:   When a man hears something that is ludicrous and absurd to the extreme I suppose he is permitted the human reaction of a smile of contempt.

The Court:   That to me is in the same line as some of the comments we have had in the past.   It may seem very funny to the defendants.   They seem to enjoy it, but I don't think it is, and their laughing is not going to have any effect.   (P. 4805.)

\* \* \* \* \*

Mr. Gladstein:   That is what we get.   Your Honor asked why people are smiling, but there is an irony to it.

The Court:   I had occasion to put a stop to some of that before.   I am familiar with the practice in criminal cases of trying to laugh something off, and I am not going to have anything but order in my court.   When the defendants get hilarious and start laughing and smiling and that sort of thing it is going to be stopped.   You can put that in your book.   (*Ibid.*)

\* \* \* \* \*

(*Conduct involved in Specification XVII—p. 4807; April 22, 1949.*)

(*Conduct involved in Specification XVIII—pp. 4829–4834, 4860–4861; April 22, 1949.*)

\* \* \* \* \*

Mr. Isserman: If the Court please, I would like to ask the Court to take judicial notice of the fact that the man Haym Solomon is dead some several years. He was a figure in the American Revolution.

The Court: This is the first time I ever have become acquainted with the gentleman. I don't see what that has got to do with it. You Communists have a way of taking all kinds of names.

Mr. Sacher: I object to that remark and ask your Honor to strike that remark and to direct the jury to disregard it.

The Court: I will deny the motion.

Mr. Gladstein: I wish to say that the remark was intended to be derogatory to the defendants and it couldn't have been intended any other way. I object to it.

The Court: You have done a lot of—

Mr. Gladstein: I would like an objection rather than an invitation to engage in repartee.

The Court: What is the objection that you want me to rule on?

Mr. Gladstein: The objection is that your Honor made a remark which is inappropriate, improper for a Judge sitting in a trial to make because it was intended to convey some kind of slur against the defendants.

The Court: Well, you see it is the old story. Mr. Isserman gets up and has his say and if I remain quiet and let you spread eagle all over the place everything is fine. But the minute I say something it is judicial misconduct. I thought the statement I made was well borne out by the

record, you have objected to it, and there it is. Now that's that. (Pp. 4956–4957.)

\* \* \* \* \*

(*Conduct involved in Specification XIX—pp. 4968–4970; April 25, 1949.*)

\* \* \* \* \*

Mr. Gladstein: Your Honor, may I correct one statement that I think the Court made inadvertently?

The Court: You may correct any statement that you made. I think you had better leave me alone for the time being. (P. 4970.)

\* \* \* \* \*

The Court: Yes, I am now proceeding to read.

Mr. Crockett: I am very glad to notice that, your Honor.

The Court: What do you mean by that, Mr. Crockett?

Mr. Crockett: I take it you said it for my benefit. You looked directly at me and I wanted you to know that I had heard it.

The Court: Well, I did not look directly at you and I did not mean that for you but for all of the counsel for the defendants, who seem to be sedulously watching and clocking the time I use looking at papers and things of that kind.

Incidentally, I consider that an impertinence.

It may be assumed, when I am looking at papers, and I rule on them, that I read them, without having counsel make remarks of that character. (Pp. 5132–5133.)

\* \* \* \* \*

Mr. Gordon: Mr. Sacher thinks that this is very funny.

Mr. Sacher: I do.

The Court: He is a great fellow. There is no question he can give more indication of what he thinks about by tittering and laughing and giggling.

Mr. Sacher: I move that that be stricken on the ground it is utterly unwarranted and not founded on the record and solely as a diversion.

The Court: I take it that that is intended to be another imputation on my motives, Mr. Sacher. You are piling up quite a record for yourself in this case. (P. 5256.)

\* \* \* \* \*

*(Conduct involved in Specification XX—p. 5302; May 2, 1949.)*

*(Conduct involved in Specification XXI—p. 5526; May 4, 1949.)*

\* \* \* \* \*

Mr. Gladstein: The statement that your Honor made and the implication and innuendo that it carried.

The Court: I haven't the remotest idea what you are talking about.

Mr. Gladstein: I will be very happy to tell you.

The Court: Go ahead.

Mr. Gladstein: One of the attorneys rose to ask a question of the Court and your Honor distorted that question by asking another question, the purpose of which was to convey an implication that the question of the attorney was improper, that the attorney was indeed impliedly stating something that reflected on the Court's motives and the Court seized that opportunity to make that kind of innuendo.

The Court: Pretty ingenious.

Mr. Gladstein: It was; but not mine.

The Court: You are trying to throw some more imputations on my motives and showing what I thought in the first place was evidently not well justified.   (P. 5700.)

\*   \*   \*   \*   \*

Mr. Gladstein: Your Honor, my assignment of misconduct was at the remarks of the Court, and I therefore submit it was improper for the Court in making—in giving any instruction to the jury on that subject, to do so in the manner that your Honor just did, and I assign therefore your remarks as misconduct.

The Court: Well, I must be very bad, all these misconducts that you have charged, and I must say it is very sad.   (P. 5794.)

\*   \*   \*   \*   \*

The Court: No, you may not have them marked. They may be submitted at some later time if you desire, but I am not going to have them submitted now for publicity purposes.

Mr. Sacher: I object to that statement. These are not put in for publicity purposes. This is put in to protect the rights of the defendants. I think that is an improper remark.

The Court: That can all be done without having all this in the record now. That is my ruling for the present. Later they may be properly identified. I have had experience with a lot of prior things that surprised me.

Mr. Sacher: I object to that remark.

The Court: You may object your head off.

Mr. Sacher: I object to that one too. It is highly prejudicial to the interests of all the defendants and I

think it is not observant of the due decorum of a court-room to make these references, your Honor.

The Court: Yes, that is all right. (P. 6116.)

*   *   *   *   *

Mr. Sacher: I object to this, your Honor—

The Court: Overruled. Mr. Sacher, I will not hear from you further.

Mr. Sacher: —unless the time and place are fixed, your Honor.

The Court: Overruled. You needn't smile and sneer at me that way either.

Mr. Sacher: I wish to state that I did not sneer or smile.

The Court: I am not going to have any more of that than I can help, I will tell you that. (P. 6118.)

*   *   *   *   *

Defendant Dennis: Is your Honor trying to intimidate the defense and counsel for the defense?

The Court: I am afraid I am not very good at intimidation, but I have had a lot of it tried on me in this case. (P. 6130.)

*   *   *   *   *

(*Conduct involved in Specification XXII—pp. 6262–6268; May 19, 1949.*)

*   *   *   *   *

Defendant Dennis: Yes. I would like to present my point of view here.

The Court: When you begin talking about a mockery of justice and all that, you know, you cannot expect me to sit here like a bump on a log and hear you call me names without saying anything. I don't like to do that.

You go ahead now and call me some more names. (P. 6264.)

* * * * *

Mr. Gladstein: . . . And I would say that your Honor should consider in determining the application of the law that Mr. Crockett has cited to this question the statement that this Court made in the course of this trial on this very question.    Unwittingly your Honor has perhaps made a singular contribution to jurisprudence.

The Court:    Thank you for that "unwittingly."    You really are something, Mr. Gladstein.    (P. 6331.)

* * * * *

The Court:    Mr. Sacher, I have been in a great many criminal cases.    I have never been in one—and I have been in many that were very important, too—where so much time was taken by counsel on arguments on a motion to dismiss at the close of the Government's case— never one that even approximated the time taken here. Of course, if you would assume, as you gentlemen all appear to, that the Judge just sits as an automaton and does not hear all this, or notice anything, or study the matter at all, or look up any law, and that then he comes to the close of the Government's case wholly uninformed as to the law and as to the facts, then perhaps further argument might be needed, but I have given this case the closest attention; I have studied it from early morning until late at night.    I have studied every authority I could lay my hands on, and I feel that the amount of argument that I have permitted here has been more than adequate.

Mr. Sacher:    May I say this to your Honor, that I think that your Honor's statements simply mean that advocacy no longer has a place in our courts.

The Court: Well, you have told me that, and Mr. Gladstein in his pleasant way has made it even more plain; but, of course, I know what is done in cases generally. When the Judge feels that he doesn't require any more argument he says so, and counsel ordinarily acquiesce. In this case, of course, it is different—

Mr. Sacher: I should like—

The Court: But I have to do the best I can to keep things going as well as I can, with making rulings that I deem proper ones, and I don't intend to be blackjacked by any form or method into doing anything that I don't think is right. (Pp. 6343–6344.)

\* \* \* \* \*

(*Conduct involved in Specification XXIII—pp. 6401–6402; May 24, 1949.*)

(*Conduct involved in Specification XXIV—pp. 6520–6522; May 25, 1949.*)

(*Conduct involved in Specification XXV—p. 6565; May 26, 1949.*)

(*Conduct involved in Specification XXVI—p. 6761; June 2, 1949.*)

\* \* \* \* \*

Mr. Sacher: May I point out, your Honor, that I have used the exact words of a question that you yourself put to the witness Budenz?

Mr. Gladstein: If the Court doesn't desire to answer Mr. Sacher's question I would like to ask the Court a question. Is it to be the rule, your Honor, that the jury is to hear only from the Government witnesses as to what they understood documents or teachings to mean, or are the defendants to be allowed to give their state of mind, their beliefs and their intentions?

The Court: I think I see what you are up to. You have had a good rest, and you are right back here because of that.

Mr. Gladstein: I assign those remarks as improper, unwarranted and misconduct.

The Court: That is all right. (P. 6765.)

*  *  *  *  *

The Court: I see you came back after a long rest determined to be provocative.

Mr. Gladstein: I had no rest. I was working on this case.

The Court: You can be just as provocative, you can be just as unruly as you choose. You know, you have tried it so often and found that it is unavailing. Now go ahead and do as you like. (P. 6791.)

*  *  *  *  *

Mr. Gladstein: That is objected to.

The Court: Object away. There is no jury present.

Mr. Gladstein: I assign that as judicial misconduct. I object very seriously and I assign it as prejudice and bias of the Court.

The Court: You did refuse to answer questions when I put them to you and your colleagues again and again. What is the use of making out you didn't do it?

Mr. Gladstein: And I assign those remarks as evidence of the prejudice of the Court.

The Court: You hear your own voice and you think because you say something that makes it so. You have been doing it here for months. Now go ahead, Mr. Crockett. Let's see what the rest of your argument is. (Pp. 6815–6816.)

*  *  *  *  *

*(Conduct involved in Specification XXVII—pp. 6845–6847; June 3, 1949.)*

\* \* \* \* \*

Mr. McCabe: . . . I say that the reason counsel—I am speaking for myself now—the reason that I have perhaps not made similar utterances is simply because of my greater training to restrain myself under great provocation.

The Court: Well, you have been impudent enough to me on numerous occasions, and were it not for the fact that I have determined that this trial shall not be disrupted by such things I should have taken action against you and against each of your colleagues long before this, but I shall not do it. I shall leave that to the proper authorities to take care of in due course, and there it shall rest, but you need be under no misapprehension; I have been quite fully cognizant of your contemptuous conduct and your impudence.

Defendant Winter: Your Honor, may I—

Mr. McCabe: I deny the imputation of impudence or misconduct. I am perfectly willing to answer to any proper body for any actions of mine in this courtroom or out.

The Court: Do you remember, Mr. McCabe, the date when you accused me of doing certain things just so that the reporters could meet the deadline for the press? Do you remember that occasion?

Mr. McCabe: Yes, I recall it quite well.

The Court: You thought what you said then was entirely proper, no doubt.

Mr. McCabe: I thought it was accurate.

The Court: Well, yes, I thought it was contemptuous. Now I just mention that so that you may not suppose that I am not aware of the precise incidents that I speak of. (Pp. 6848–6849.)

\* \* \* \* \*

80

(*Conduct involved in Specification XXVIII—pp. 6936–
6937; June 7, 1949.*)

\* \* \* \* \*

Mr. Sacher: I am offended on these constant asper-
sions on the veracity of representations that I make. I
am an officer of this court and I resent these—

The Court: There was an instance when you delib-
erately lied to me when they were passing these press
releases. You said that they were not and you were
caught red-handed.[3]

Mr. Sacher: That is the most offensive charge that can
be made against an officer of the court. Your Honor
knew that that was happening in the back part of the
courtroom and I was unable to see that. That is one of
the most offensive things you can do to a lawyer. What
has a lawyer got but his honor.

The Court: That is the first thing you did and you
were caught red-handed.

Mr. Sacher: That is the most detestable thing I ever
heard from a judge. I resent that and I urge that it be
expunged from the record.

The Court: You asked me why I wouldn't take your
word for anything and I told you. I might enumerate
other incidents were I so inclined. You can get just as
violent as you want; the fact is I do not take your word
for anything.

Mr. Sacher: I will defend my honor as a member of
the bar against your Honor or anybody else. I will not
accept a denunciation that I am a liar. When the time
comes that I don't have the mental capacity to defend

---

[3] The incident referred to by the judge—reported at pages 4228–
4229 of the record—was the basis for his Specification XV. The
conviction of Sacher on that specification was unanimously reversed
by the Court of Appeals because that court did not think it was suf-
ficiently clear "that Sacher was attempting to mislead the court."
182 F. 2d 416, 424–425.

my clients on any other basis than lying I will resign from the bar. I think an idiot resorts to lying. I don't have to do it.

The Court: You did it.

We better let these little amenities go. I can see from your belligerent manner if you thought you could, you might physically come up to the bench and physically attack me. I know your manner, and it doesn't frighten me in the slightest degree. Let's get back to what we were doing. (P. 7029.)

\* \* \* \* \*

The Court: I have a very definite opinion of you, too, Mr. Crockett.

Mr. Crockett: But I am not speaking about Mr. Crockett.

The Court: But I shall not express it because I see no occasion to do it. I should not have done it to Mr. Sacher, had he not asked me.

Mr. Crockett: I am not speaking about Mr. Crockett, and I am fully aware that you probably do have a very definite opinion as to Mr. Crockett.

The Court: Why, I have never been so insulted and baited, nor have I ever heard of any other judge being so insulted and baited, during the trial as I have by you lawyers representing the defendants here in this case from the 17th of January on, and I will make no bones about it. That is what has been going on, and I have tolerated it because of the reasons I have indicated, but make no misunderstanding as to what I think about it. (Pp. 7030–7031.)

\* \* \* \* \*

(*Conduct involved in Specification XXIX—pp. 7086–7087; June 9, 1949.*)

\* \* \* \* \*

The Court: I see Mr. Sacher smiling.

Mr. Sacher: Your Honor takes awfully good notice about my facial expressions, but when Mr. Gladstein spoke about Mr. Gordon jumping up like a poppinjay you saw nothing.

The Court: Well, you did seem pleased. Now you seem different.

Mr. Sacher: We are under surveillance but you never see anything that the prosecution does.

The Court: That is what you say. It may be because there is nothing done by the prosecution to make it necessary for comment.

I told you some little time ago that I wasn't going to permit you or the other lawyers to get away with anything while I was presiding here and I shall not. (P. 7094.)

\* \* \* \* \*

The Court: I wish you would stop talking about my nodding my head, scratching my head and pulling my ears. Why don't you leave that all out? What good does that do.

Mr. Isserman: Well, whether your Honor—

Mr. Crockett: Pardon me one minute. I think it is very important because there are some things that are not made a matter of record on the Court—

The Court: You haven't missed any of them.

Mr. Crockett: —so far as the transcript is concerned. Very frequently I notice in the course of testimony your Honor makes frequent glances over toward the jury or some facial expression that gives the impression, to me at least, that the Court—

The Court: Well, it is funny—

Mr. Crockett: Pardon me. I think that whenever it is so obvious, as it was a while ago, some mention of it should be made so that it will be carried in the record.

The Court: If there is something about my winking at the jury or something of that kind, I am surprised that you did not mention it at the time.

Mr. Crockett: No, I have not noticed a winking yet. If I had I would have mentioned it.

The Court: Well, there isn't much that you have missed, but you may just as well go ahead and get it all down and out of your system. I deny that I have ever done anything of the kind. I wouldn't stoop to such a thing, and I do not see how you lawyers have the effrontery to keep saying so. (Pp. 7269–7270.)

\* \* \* \* \*

Mr. Gladstein: Now your Honor has said that if this exhibit were received it would be unprecedented. Now first of all I think that that wouldn't be an obstacle because a number of unprecedented things have already occurred commencing with the returning of the indictment.

The Court: Ha ha, you know I expected you were going to do that.

Mr. Gladstein: I can't overlook the opportunity nor the necessity to reply to your Honor.

The Court: All right.

Mr. Gladstein: This is an unprecedented case. It presents unprecedented issues. It has been handled in an unprecedented way.

The Court: I'll say it has. (P. 7670.)

\* \* \* \* \*

Mr. Gladstein: May I say one word?

The Court: If you ever did that, Mr. Gladstein, I think I would drop dead.

84

Mr. Gladstein: When I say one word, I mean it in a lawyer's sense.

The Court: All right. (P. 7676.)

\* \* \* \* \*

The Court: Well, you accuse me of being an old tyrant and everything under the sun, accuse me of judicial misconduct of various kinds, and I take that in good temper, and you speak about not having a chance to prove your case. You have had ample chance to prove your case and anybody who reads this record can see that you have had. So there is no need of your saying how I cut you out and how I won't take the necessary time. I am going to take the necessary time but I am going to be the one to decide what is necessary. (P. 7929.)

\* \* \* \* \*

(*Conduct involved in Specification XXX—p. 8045; June 30, 1949.*)

\* \* \* \* \*

The Court: Mr. Sacher, you cannot laugh these things off.

Mr. Sacher: I am not laughing anything off.

The Court: You must have laughed at something, and *it is very offensive to me.*

Mr. Sacher: It is so obviously unrelated to the case, I cannot imagine why it is being asked.

The Court: Well, I can imagine, and I imagine there are others who can too, and I think, perhaps, that is the reason you are laughing—

Mr. Sacher: No, that is not the reason at all.

The Court: —laughing it off.

Mr. Sacher: That is not the reason I am laughing.

The Court: You should stop.

Mr. Sacher: And I should say that I haven't been laughing.

The Court: You should have thought of that first. (P. 9167.)

\* \* \* \* \*

Mr. Sacher: It used to be done to me on cross-examination.

The Court: What used to be done to you?

Mr. Sacher: This business of pointing out that a question was not in the precise words of the preceding question.

The Court: I recall nothing of that kind. I take it that is another one of your offensive comments attempting to make it appear that I am partial to the Government— (P. 9185.)

\* \* \* \* \*

Mr. Sacher: But it is contradictory. It speaks of a rule and it speaks of "sometimes." Now which is it? Is it sometimes or is it a general rule?

Mr. McGohey: I will withdraw the question and reframe it, your Honor, so that we can save the argument and get on.

The Court: I wish to state on the record that I am physically and mentally incapable of going through very much more of this wrangling and argument and I shall have to do something about it if it is continued and counsel refuse to obey my admonition. It is more than any human being can stand. (P. 9220.)

\* \* \* \* \*

Mr. Isserman: If the Court please, may I be heard for a moment?

86

The Court:  I suppose my mentioning my state of fatigue has merely served as a spur to additional argument this morning.  (P. 9224.)

\*  \*  \*  \*  \*

Defendant Dennis:  . . .  In view of the biased and prejudicial rulings, restricting the—

The Court:  You mean bias of mine?

Defendant Dennis:  Biased, as I understood them, your Honor.

The Court:  I say, but you mean bias by me?  Do you say that?

Defendant Dennis:  On the part of the Court.

The Court:  That is what I thought.  I thought it might be well to have it clear what you claimed.  (P. 9344.)

\*  \*  \*  \*  \*

(*Conduct involved in Specification XXXI—pp. 9376–9377, 9403–9405; Aug. 1, 1949.*)

(*Conduct involved in Specification XXXII—pp. 9533–9537, 9541–9543; Aug. 3, 1949.*)

\*  \*  \*  \*  \*

Mr. Sacher:  . . .  I don't want to appeal to you on the basis of serving Mr. Isserman's comfort or Mr. Gladstein's or Mr. Crockett's—

The Court:  Or that golf player, Mr. McCabe.

Mr. Sacher:  Well, he is not a golf player.  I think you do him an injustice.

The Court:  If he hadn't been playing golf for about a week when I saw him the other day, I miss my guess.

Mr. Sacher:  No.  I am sure if you are not a golf enthusiast then you are doing him an injustice; if you are, then you are just envious.

The Court:  Well, to tell you the honest truth, that is just putting the finger right on it.   (P. 9688.)

\* \* \* \* \*

The Court:  You see, I have made certain rulings in the last few days which I felt the circumstances compelled me to make and which have led to the rulings that I am now making.  I am determined to survive this case.

Mr. Sacher:  Well, no one has any purpose that you shouldn't, your Honor.

The Court:  And it is very true that there has been an evolution in my rulings, and necessarily so, and although all the defense, including some of the defendants and all of the lawyers are calling me all kinds of names, I was trying, according to my lights, to be extremely liberal, and I am quite sure that the record will show that I was.  I then found that a lot of these matters, such as the one you speak of now, simply had to be cut out. They have no bearing on the case, and so I have had to change the character of my rulings on the basis of preventing cumulative evidence and on the basis generally of having a power that must exist to terminate a case within bounds, such as to be consistent with the maintenance of the health of the jurors and the Judge and everybody concerned.   (P. 9689.)

\* \* \* \* \*

(*Conduct involved in Specification XXXIII—p. 9731; Aug. 5, 1949.*)

(*Conduct involved in Specification XXXIV—pp. 9886–9887; Aug. 10, 1949.*)

\* \* \* \* \*

Mr. Crockett:  I object, your Honor, unless Mr. Gordon is specifying some particular classic by some particular author.

The Court: I think he will get around to it in a minute. Overruled.

Mr. Crockett: I thought we were not having these general questions, though.

The Court: Well, you see, I get the import of what you say. You are just trying to make it appear, perhaps for the benefit of the spectators, that I ruled one way this morning as to your general questions and that I am so prejudiced and biased that I ruled just the opposite on similar questions put by Mr. Gordon. Now, you know there is nothing in that. These questions are put on cross-examination here and they are perfectly proper, and I suggest that those little ironical insinuations be omitted. (P. 10228.)

\* \* \* \* \*

Mr. Gladstein: I object to your Honor's question.

The Court: Overruled.

Mr. Gladstein: Also to the manner in which your Honor asked the question.

The Court: There is nothing about the manner.

Mr. Gladstein: And the gesture that accompanied it.

The Court: I raised my hand and you criticized me a number of times and I see no basis for such criticisms. I am going to get at this—

Mr. Gladstein: Naturally your Honor sees no basis for criticism but an attorney who represents and defends clients may have a different view.

The Court: What I object to is false statements of the things that are said to be done by me and not done by me. That is what I object to and you and your colleagues have filled this record with statements of things I am supposed to have done and I never did. Every time

you start that I am going to see the record is kept straight. (Pp. 10718–10719.)

\* \* \* \* \*

(*Conduct involved in Specification XXXV—p. 10748; Aug. 26, 1949.*)

(*Conduct involved in Specification XXXVI—pp. 10855–10856; Aug. 29, 1949.*)

(*Conduct involved in Specification XXXVII—p. 11213; Sept. 9, 1949.*)

(*Conduct involved in Specification XXXVIII—pp. 11418–11421; Sept. 14, 1949.*)

(*Conduct involved in Specification XXXIX—p. 11432; Sept. 14, 1949.*)

(*Conduct involved in Specification XL—pp. 12064–12065; Oct. 4, 1949.*)[4]

MR. JUSTICE DOUGLAS, dissenting.

I agree with MR. JUSTICE FRANKFURTER that one who reads this record will have difficulty in determining whether members of the bar conspired to drive a judge from the bench or whether the judge used the authority of the bench to whipsaw the lawyers, to taunt and tempt them, and to create for himself the role of the persecuted. I have reluctantly concluded that neither is blameless, that there is fault on each side, that we have here the spectacle of the bench and the bar using the courtroom for an unseemly demonstration of garrulous discussion and of ill will and hot tempers.

I therefore agree with MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER that this is the classic case where the trial for contempt should be held before another judge. I also agree with MR. JUSTICE BLACK that petitioners were entitled by the Constitution to a trial by jury.

---

[4] The judgments of contempt on all specifications were filed on October 14, 1949.